**UNITED STATES of America et al.,**
**Plaintiffs-Appellees,**

v.

**STATE TAX COMMISSION OF the STATE OF MISSISSIPPI et al.,**
**Defendants-Appellants.**

**No. 73-3034.**

United States Court of Appeals,
Fifth Circuit.

Dec. 13, 1974.

634

James Holmes Haddock, Jackson, Miss., Carl F. Andre, A. F. Summer, Atty. Gen. of Miss., Jackson, Miss., for defendants-appellants.

Robert E. Hauberg, U. S. Atty., James B. Tucker, Asst. U. S. Atty., Jackson, Miss., Wallace H. Johnson, Asst. Atty. Gen., Lands Div., Larry G. Gutterridge, Jacques B. Gelin, Dept. of Justice, Washington, D. C., for plaintiffs-appellees.

Before COLEMAN, CLARK and RONEY, Circuit Judges.

COLEMAN, Circuit Judge:

This is an appeal by the Mississippi State Tax Commission and the Sheriff

of Neshoba County from a judgment granting a permanent injunction against the assessment and collection of sales and contract taxes from the Mississippi Band of Choctaw Indians, the Chata Development Company, and the Choctaw Housing Authority. The District Court held that under the federal Constitution and a state exemption hereinafter described the Tribe and its instrumentalities were exempt from such taxes.

We reverse, with directions to dismiss the complaint for lack of jurisdiction.

## FACTS

In 1965, to take advantage of low rent federal housing programs, the Mississippi Band of Choctaw Indians acted to establish the Choctaw Housing Authority.

In 1968, the Mississippi Legislature specifically exempted from sales tax "sales to the Mississippi Band of Choctaw Indians, but not to Indians individually", Section 8, Chapter 588, Miss.Laws, 1968. Exempting one group from the payment of taxes which other groups are required to pay, with no rational basis stated, raises substantial "equal protection" specters. For the purposes of this litigation the validity of the exemption is assumed, but that is an assumption only. In any event, the statutory exemption was granted solely to "the Mississippi Band of Choctaw Indians", with nothing said as to any separately identifiable agencies or subsidiaries or instrumentalities of the Band.

In 1970, at the request of the "tribal council", the Chata Development Company was *incorporated* under the laws of Mississippi as a non-profit corporation but for the purpose of engaging in certain aspects of the construction business [Chata is an ancient method of spelling "Choctaw"]:

In 1971, Chata made a contract with the Choctaw Housing Authority to build some fifty houses for $696,772. On September 9 of that year the Tax Commission instructed Chata to file a return and pay the sales taxes required of a contractor. The "tribal council" replied by letter, claiming the benefit of the 1968 exemption.

In October, the Tax Commission informed Chata that neither it nor the Housing Authority (as distinguished from the Mississippi Band of Choctaw Indians) were exempt from sales tax on purchases and filed its notice of tax lien and judgment in the sum of $19,161.23, solely against Chata, the non-profit corporation. On November 4, 1971, on the tax lien filed, the Tax Commission instituted garnishment proceedings against Chata.

There was no request filed with the State Tax Commission for a hearing, see sources cited in Section 27–65–45, Miss. Code, 1972. There was no suit in the Chancery Court for refund, or appeal to the Supreme Court, as authorized by Section 27–65–47, Miss.Code, 1972, and predecessor statutes. The remedial procedures provided by Mississippi law were wholly bypassed.

On May 18, 1972, the United States rode into the fray. It brought suit on behalf of the Mississippi Band to enjoin the Tax Commission from assessing, collecting, and attempting to collect sales taxes from the Development Company and the Authority. The suit also sought to have declared null and void the tax lien entered against Chata.

The District Court found that the United States was not the real party in interest (Rule 17(a), Federal Rules of Civil Procedure), allowed Chata Development Company, against whom the taxes had been assessed, to join the suit as the real party plaintiff, held that the Mississippi Legislature had exempted the Choctaw Band from the taxes in question, and permanently enjoined the defendants:

(1) from assessing, collecting, or attempting to collect any taxes levied by the provisions of the Mississippi State Tax law from the Mississippi Band of Choctaw Indians, Chata Development Company, and Choctaw Housing Authority;

(2) from assessing, collecting, or attempting to collect from any material men and suppliers furnish-

ing materials to the Mississippi Band, Chata, or the Choctaw Housing Authority any tax under § 10108, Miss.Code Ann., 1942;

(3) from proceeding further to collect the $19,161.23 alleged due in the cause then pending in Neshoba County Circuit Court;

(4) the tax lien was declared null and void.

Appellant State Tax Commission argues that the United States had no lawful authority to bring this action, that the District Court lacked jurisdiction of the parties and the subject matter, and that if a controversy existed it was for state administrative and judicial determination, rather than federal.

When this suit was initially filed, the United States asserted jurisdiction on 28 U.S.C. § 1345 and § 1362. In order for § 1345 to apply, suit must be brought by the United States, or one of its agencies or officers thereof. However, the District Court found that the United States was not the real party in interest and ordered that the Chata Development Company, a Mississippi corporation, be joined as a party plaintiff. Chata was joined, and the suit proceeded.

Whether Chata, the corporation, was obligated to pay the sales taxes required of it as the building contractor was the real issue in the case. As already indicated, Rule 17(a), Fed.R.Civ.P. requires that *every* action be prosecuted in the name of the real party in interest. The United States sought to meet this requirement by alleging that the suit was brought on behalf of the Mississippi Band of Choctaw Indians, that Chata "is an instrumentality and subsidiary of the Tribe, established by tribal resolutions". In any event, the United States sought no recovery for itself but only on behalf of a corporate taxpayer.

The United States knew that it could not lend its name to a suit for the benefit of private litigants, United States v. San Jacinto Tin Company, 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747 (1888); State of Wisconsin v. First Federal Savings & Loan Association, 7 Cir., 1957, 248 F.2d 804, cert. denied 355 U.S. 957, 78 S.Ct. 543, 2 L.Ed.2d 533; Wright, Law of Federal Courts, 68 (2d Ed., 1970).

■ This presents a problem because Chata had no contract with the Mississippi Band of Choctaw Indians, the group named in the statute as the beneficiary of the exemption. Moreover, Chata, as the contractor, was a corporation, chartered under Mississippi law. The benefits and privileges of such a charter had been sought and obtained when there could have been no doubt about the status imposed upon corporations by law. The law of Mississippi is that a corporation "is an entity separate and distinct from its stockholders", Illinois Central Railroad Company v. Mississippi Cotton Seed Products Company, 166 Miss. 579, 148 So. 371 (1933). Thus in an effort to avoid the taxes which Mississippi corporations are required to pay, Chata has cast itself in the untenable role of claiming the benefits and denying the burdens of the status which its incorporators voluntarily sought.

■ The Mississippi rule is the same as the general rule, that a corporation is a creature of the law and it is a legal personality, separate and apart from that of its owners, Berger v. Columbia Broadcasting System, 5 Cir., 1972, 453 F.2d 991, cert. denied 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89; Burnet v. Clark, 287 U.S. 410, 53 S.Ct. 207, 77 L.Ed. 397 (1932); Overstreet v. Southern Railway Company, 5 Cir., 1967, 371 F.2d 411, cert. denied 387 U.S. 912, 87 S.Ct. 1700, 18 L.Ed.2d 634. The corporate fiction is not to be disregarded because of mutuality of corporate names, stockholders and officers. The fact that one entity owns all the stock in the other is not determinative. The test is whether Chata as a corporation actively owned and conducted its own business, Overstreet v. Southern Railway Company, *supra.*

Chata's directors are all members of the Band but the testimony revealed that "the tribe is not the corporation" and that the Tribal Council is not the same as the Chata Development Compa-

ny. The testimony further revealed that 35% of Chata's employees were not Indians and that the houses being built could be occupied by those *who are not Indians*.

■■ In these circumstances, applying Mississippi law, we hold that Chata was an entity "separate and distinct" from the Mississippi Band of Choctaw Indians, the group named as the beneficiary of the exemption in Mississippi's Sales Tax statutes. The United States was attempting to lend its name to a suit on behalf of a private corporation and was not the real party in interest. When it so held, the District Court was right.

■ In the absence of a justiciable interest on behalf of the United States, 28 U.S.C. § 1345 conferred no jurisdiction.

■ Neither is 28 U.S.C. § 1362, of any jurisdictional assistance. Chata Development Company is not an Indian Tribe or Band. Even looking through the corporate form to the individual Indian incorporators would not help, for § 1362 contains no general grant of jurisdiction for a suit merely because an Indian is a party, 1 Moore's Federal Practice, § 0.74 [2.–2].

Since this is a Mississippi tax, imposed on the commercial activities of a Mississippi corporation, we detect no federal question in this case.

This does not eliminate all of the serious jurisdictional questions.

There is a specific Act of Congress, 28 U.S.C. § 1341, which reads as follows:

"The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."

The application of this statute to Mississippi tax collection procedures had the full dress consideration of this Court in Bland v. McHann, 1972, 463 F.2d 21, cert. denied, 410 U.S. 966, 93 S.Ct. 1438, 35 L.Ed.2d 700 (1973).

We there stated that the statute applied to anticipatory action as well as to ongoing efforts to collect. It also applies to suits for refunds, 463 F.2d at 25. We there reaffirmed the proposition that Mississippi provides a "plain, speedy, and efficient" remedy within the meaning of the statute.

In *McHann* we concluded:

"Taxpayers' complaints that the Mississippi remedy is inadequate appear in reality to be an argument that a better remedy would be available in the federal courts. Neither the judicial decisions nor § 1341 requires that . the state remedy be the best remedy available or even equal to or better than the remedy which might be available in the federal courts. Section 1341 merely requires that the state remedy be 'plain, speedy and efficient.' Thus, in view of the district court's finding, this court's decision in *Monaghan* and our own independent review of the available state remedy, we conclude that the Mississippi remedy is plain, speedy and efficient." 463 F.2d 29.

In *McHann* we relied, as indicated, upon the jurisdictional holding in Shepherd v. Monaghan, 5 Cir., 1958, 256 F.2d 882, which was a Mississippi sales and use tax case and in which the right to recover improperly collected taxes was specifically held to afford an adequate remedy.

■ The appellees should have invoked the aid of the State Courts in their quest for relief from the tax liability here at issue. The District Court had no jurisdiction to entertain the effort.

## THE STATUS OF CHOCTAW INDIANS IN THE STATE OF MISSISSIPPI

Prior to 1871, when Congress put a stop to the practice, there existed a widespread procedure in which the United States made treaties with the respective Indian Tribes, particularly with reference to the acquisition of Indian lands.

Article 6, Clause 2, of the Constitution provides that all treaties made under the authority of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding". Consequently, these Indian treaties, when ratified by the Senate, assumed equal status with the Constitution itself as a part of the "supreme Law of the Land".

Prior to the final removal of the Choctaw Indian TRIBE from Mississippi to the Indian Territory, which occurred pursuant to the terms of Treaty of Dancing Rabbit Creek, ratified by the Senate February 24, 1831, the United States made the following treaties with the Tribe:

### Choctaw Indian TREATIES

(See Hutchinson's Miss.Code, 1848,
Chapter V, pp. 117–136)

| Date | Place | Purpose |
| --- | --- | --- |
| Jan. 3, 1786 | Hopewell, in north-western South Carolina | Defined the boundaries of the Choctaw Nation North of the 31° of North Latitide, East of the Natchez District. |
| Dec. 7, 1801 | Fort Adams | Permitted the conversion of the Natchez Trace into a federal road; ceded 2,245,-720 acres of land between 31° and the Yazoo River. |
| Oct. 17, 1802 | Fort Confederation on the Tombigbee | To mark the boundary from the Chickasawhay to the Tombigbee. |
| Aug. 31, 1803 | Ho-buckin-too-pa | Ceded 1,000,000 acres. |
| Nov. 6, 1805 | Mt. Dexter | Ceded 4,374,244 acres. |
| Oct. 24, 1816 | St. Stephens | Ceded land where Columbus, Mississippi, now stands. |
| Oct. 18, 1820 | Doak's Stand On the Natchez Trace near present day Canton, Mississippi, negotiated by Gen. Andrew Jackson and Chief Pushmataha | Exchanged 5,000,000 acres in Mississippi for lands between the Arkansas, the Red, and the Canadian Rivers. |
| Jan. 20, 1825 | Washington | Agrees that all Indians living on the exchanged lands in Mississippi may remain there if they so desire and shall receive 640 acres. |

The foregoing treaties culminated in the Treaty of Dancing Rabbit Creek, signed near present day Macon, Mississippi, ceding the last of the Tribal domain in Mississippi, 10,500,000 acres.

Contrary to the practice followed in certain notorious cases, the Treaty of Dancing Rabbit Creek required no Indian to leave Mississippi. Permission to remain and become Mississippi citizens was expressly assured.

Article XIV of the Dancing Rabbit Treaty provided:

> *"Each Choctaw head of a family being desirous to remain and become a citizen of the States, shall be permitted to do so,* by signifying his intention to the Agent within six months from the ratification of this Treaty, and he or she shall thereupon be entitled to a reservation of one section of six hundred and forty acres of land, to be bounded by sectional lines of survey; in like manner shall be entitled to one half that quantity for each unmarried child which is living with him over ten years of age; and a quarter section to such child as may be under ten years of age, to adjoin the location of the parent. If they reside upon said lands intending to become citizens of the States for five years after the ratification of this treaty, in that case a grant in fee simple shall issue; said reservation shall include the present improvement, of the head of the family, or a portion of it. Persons who claim under this article shall not lose the privilege of a Choctaw citizen, but if they ever remove are not to be entitled to any portion of the Choctaw annuity." [Emphasis added].

■ This article is self explanatory. The last sentence of Article XIV: "Persons who claim under this article shall not lose the privilege of a Choctaw citizen, but if they ever remove are not to be entitled to any portion of the Choctaw annuity", meant that if the individual deciding to remain in Mississippi should ever choose to join his brethren in the Indian Territory he could not be denied that privilege, but he was to be cut off from any portion of the annuity payable to the Tribe under the Treaty, because he had already received his compensation in the form of land. See, Winton v. Amos, *post.*

In the beginning, one third (5,000) of the Choctaws elected to remain in Mississippi; the others were moved West in 1831, 1832, and 1833. Migration continued sporadically, however, and by 1900 only 2,000 Choctaws remained in Mississippi.[1] As a matter of fact, Greenwood Leflore, the head Chief of the Choctaws, whose boyhood home was on the Natchez Trace at French Camp in present day Choctaw County, chose not to go West, became an immensely wealthy man, and exercised his Mississippi citizenship by serving with distinction in the Mississippi State Senate.

The Dancing Rabbit Treaty opens with the following language:

> "Now, therefore, that the Choctaws may live under their own laws in peace with the United States and the State of Mississippi, they have determined to sell their lands east of the Mississippi."

All prior treaties and agreements where inconsistent with the Dancing Rabbit Treaty were declared null and void.

It was further ordained that no part of the land granted the Tribe should ever be embraced in any territory or state, Article IV.

Clearly the Tribe, as an entity, was never to be a part of any state or territory.

---

1. McLemore, A History of Mississippi, 1973, p. 88. Anyone interested in the history of this noble tribe of Red men should read: DeRosier, The Removal of the Choctaw Indians, U. of Tennessee Press, 1970; Debo, The Rise and Fall of the Choctaw Republic, U. of Oklahoma Press, 1961; Foreman, Indian Removal, U. of Oklahoma Press, 1953; Foreman, The Five Civilized Tribes, U. of Oklahoma Press, 1934.

Thus, by the specific language of the Treaty, there can be no doubt that when it was ratified by the Senate the tribal character of the Choctaw Indians in Mississippi came to an end.

DeRosier wrote, p. 128, "After more than thirty years of negotiations, the Choctaws had been persuaded to relinquish their precious homeland and emigrate to a new Indian territory in the west".

In Indian Removal, p. 31, Foreman writes that those who did not go west "preferred to stay and be incorporated in the state".

Insofar as the Government of the United States was concerned, the Choctaw Indians who remained in Mississippi after Dancing Rabbit were left in limbo for ninety years, less two, (1830–1918).

Congress passed the Act of May 25, 1918 (40 Stat. at L. 573) appropriating monies for the Bureau of Indian Affairs. Under the heading "MISSISSIPPI" the following was provided:

"For the relief of distress among the full-blood Choctaw Indians of Mississippi, including the pay of one special agent, who shall be a physician, one farmer, and one field matron, $5,000; for their education by establishing and maintaining day schools including the purchase of lands and the construction of necessary buildings, $20,000; for the purchase of lands, including improvements thereon, not exceeding eighty acres for any one family, for the use and occupancy of said Indians, to be expended under conditions to be prescribed by the Secretary of the Interior for repayment to the United States, under such rules and regulations as he may direct, $25,000; for the purpose of encouraging industry and self-support among said Indians and to aid them in building homes, in the culture of fruits, grains, cotton and other crops, $25,000, which sum may be used for the purchase of seed, animals, machinery, tools, implements, and other equipment necessary, in the discretion of the Secretary of the Interior, to enable said Indians to become self-supporting, to be expended under conditions to be prescribed by the said Secretary for its repayment to the United States on or before June thirtieth, nineteen hundred and twenty-five; in all, $75,000 to be immediately available." [2]

This Act glaringly omits reference to the Mississippi Choctaws as a "tribe" and omits any mention of a "reservation". Obviously, none existed.

A special agent was sent to Philadelphia, Mississippi, in 1918, and he found that the Choctaws did not attend school and were generally leading an isolated life. The great majority of the Indians were living in Neshoba, Leake, Newton, Scott, Jones, Winston and Noxubee Counties. The poor health, education and economic status of the people led to the establishment of an agency at Philadelphia in 1918.

The land purchase program was initiated in 1921. Under this program, the government would buy a tract of land, sub-divide it into twenty to forty acre plots, and build a small house on each plot. The land was resold to the Indians on a reimbursable basis. From 1921 until 1932, the government bought 3,680 acres of land for the Choctaws. It was sold to 88 Indians on the reimbursable plan. None of it was ever paid for. The United States now holds it in trust

---

2. The United States parted with title to the land either by specific grants in the 1830 Treaty or subsequent patents to private purchasers. It then repurchased this land in the Twentieth Century from the contemporary owners. The State has never by appropriate legislation consented to exclusive jurisdiction by the United States. The government was simply an ordinary proprietor. See Article I, Section 8, Clause 17, United States Constitution; Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963).

for the Indians, Act of June 21, 1939, 53 Stat. 851.

In Winton v. Amos and others, known as Choctaw Indians, 255 U.S. 373, 41 S. Ct. 342, 65 L.Ed. 684 (1921), the Supreme Court had occasion to review, in depth, the status of the Mississippi Choctaws subsequent to the Dancing Rabbit Treaty. It is to be regretted that the lengthy and expositive analysis set forth in the opinion of the Court cannot be repeated here, but at 378, 41 S.Ct. at 344 we find the following:

"The mixed-blood Choctaws who elected to remain in Mississippi were provided for under article 19, while the full bloods who remained and elected to become citizens of the state were provided for under article 14; hence fullblood Mississippi Choctaws have always been called 'Fourteenth Article claimants.' Choctaws who remained in Mississippi under that article adopted the dress, habits, customs, and manner of living of the white citizens of the state. They had no tribal or band organization or laws of their own, but were subject to the laws of the state. They did not live upon any reservation, nor did the government exercise supervision or control over them. No funds were appropriated for their support, though much land was given to them. Neither the Indian Office nor the Department of the Interior assumed or exercised jurisdiction over them, and they never recognized them either individually or as bands, but regarded them as citizens of the State of Mississippi, and the Department held it had no authority to approve contracts made with them."

As late as August 31, 1936, as it appears in the record, the Solicitor of the Department of the Interior ruled that "there is in fact no existing tribe of Indians in Mississippi known as the Choctaw Tribe".

The matter boils down to whether the Mississippi Choctaws became a tribe and live on a reservation as the result of the Wheeler-Howard Act (approved June 18, 1934, 48 Stat. 984) and the Proclamation of the Department of the Interior issued in 1944.

For the reasons hereinafter set forth our answer to both issues is in the negative.

Section 19 of the Wheeler-Howard Act reads as follows:

"The term 'Indian' as used in this Act shall include persons of Indian descent *who are members of any recognized Indian tribe now under Federal jurisdiction,* and all persons who are descendants of such members who were, *on June 1, 1934, residing within the present boundaries of any Indian reservation,* and shall further include all other persons of one-half or more Indian blood. For the purposes of this Act, Eskimos and other aboriginal peoples of Alaska shall be considered Indians. *The term 'tribe' wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation.* The words 'adult Indians' where used in this Act shall be construed to refer to Indians who have attained the age of twenty-one years." [Emphasis added].

The language of Section 19 positively dictates that tribal status is to be determined as of June, 1934, as indicated by the words "any recognized Indian tribe *now* under Federal jurisdiction" and the additional language to like effect.

■ The Mississippi Choctaws did not, in June, 1934 fall within the status prescribed by the Act. Their vote in 1935 to accept the benefits of the Act was not authorized by that statute. They could not confer upon themselves the benefit of a law in which, by its very terms, they had not been included.

■ This omission was not, and could not have been, cured by a Proclamation of the Department of the Interior, grounded on the Act of 1934, which in 1944 purported to recognize the tribal

organization of the Mississippi Band of Choctaw Indians and which attempted to declare that the lands purchased for their use and held for them in trust is an Indian Reservation. While this Proclamation may, until set aside in appropriate proceedings, be binding on the Secretary of the Interior, a matter about which Mississippi has no standing to complain, and about which we intimate no opinion, there was no authority in the statute cited in its support and the Proclamation is not binding on the State in the exercise of its lawful authority over its citizens, human or corporate.

Deciding the case before us, and purely in a jurisdictional context, we must reject the assertions of the United States that

"The Mississippi Band of Choctaw Indians is an Indian tribe."
and

"The Tribe [is] situated on the Mississippi Band of Choctaw Indians Reservation and in Indian Country in Mississippi over which the United States has exclusive jurisdiction."

Therefore, if we are mistaken in our first holding that the United States is not a real party in interest in the efforts of the corporation to avoid paying the taxes assessed against it, the result is the same. The District Court remains without jurisdiction to entertain the suit.

We intimate no opinion as to the liability of the corporation to pay the tax. It is a matter of state law and, for lack of jurisdiction, is not before us.

The judgment of the District Court is reversed, and remanded with directions to dismiss the complaint, without prejudice to the right of the plaintiffs to seek any appropriate relief provided by state law.

Reversed and remanded, with directions.