**UNITED STATES of America et al.,**
**Plaintiffs-Appellees,**

v.

**STATE TAX COMMISSION OF the**
**STATE OF MISSISSIPPI et al.,**
**Defendants-Appellants.**

No. 73–3034.

United States Court of Appeals,
Fifth Circuit.

July 19, 1976.

Rehearing and Rehearing En Banc
Denied Oct. 27, 1976.

James Holmes Haddock, Carl F. Andre, A. F. Summer, Atty. Gen. of Miss., Jackson, Miss., for defendants-appellants.

S. Bobo Dean, Washington, D. C., for Miccosukee tribe of Indians of Florida.

Robert E. Hauberg, U. S. Atty., James B. Tucker, Asst. U. S. Atty., Jackson, Miss.,

Wallace H. Johnson, Asst. Atty. Gen., Larry G. Gutterridge, Jacques B. Gelin, Lands Div., Dept. of Justice, Washington, D. C., for plaintiffs-appellees.

## ON PETITION FOR REHEARING

(Opinion Dec. 13, 1974, 5 Cir. 1974, 505 F.2d 633)

Before COLEMAN, CLARK and RONEY, Circuit Judges.

COLEMAN, Circuit Judge.

Our original opinion in this case is reported, 505 F.2d 633 (5 Cir. 1974).

Since the rendition of that opinion, the Supreme Court of Mississippi, in the context of a criminal case, has had occasion to pass on the issue of whether the State has been deprived of jurisdiction over criminal offenses committed by Indians on the Choctaw Indian Reservation. In an exhaustive, scholarly opinion, it was held that Mississippi retains such jurisdiction, *Tubby v. State*, 327 So.2d 272 (Miss., 1976).

There are two decisive factors in this case.

### I

### *The Chata Development Company*

In the prior opinion we held that Chata, a Mississippi corporation, chartered in compliance with Mississippi law, is an entity separate and apart from the Mississippi Band of Choctaw Indians; that in this suit the United States is attempting to lend its name to a suit on behalf of a private corporation and thus was not a real party in interest.

We adhere to that view.

Chata was a building contractor, no more and no less. It had a contract to build houses for the Choctaw Housing Authority. Unless the Authority was contracting with itself, which would have been a barefaced subterfuge, then Chata's separate identity,

capacity, and existence cannot be doubted, as a matter of either law or fact.

## II

### The Status of the Mississippi Choctaw Indians

■ After the ratification of the Treaty of Dancing Rabbit Creek the Choctaw Indians who chose to remain in Mississippi were no longer an Indian Tribe, they were citizens of Mississippi, and they most assuredly were not wards of the United States. The only way they could reassume Choctaw tribal citizenship was to move to the Indian Territory.

As cited in the original opinion, a thorough discussion of this situation was authored by Mr. Justice Pitney in *Winton v. Amos,* 255 U.S. 373, 41 S.Ct. 342, 344, 65 L.Ed. 684 (1921). That opinion of the Supreme Court sets forth in interesting detail the many *unsuccessful* efforts of the Mississippi Choctaws to reassume Choctaw citizenship without moving to the Indian Territory. See, also, *Choctaw Nation v. United States,* 119 U.S. 1, 7 S.Ct. 75, 30 L.Ed. 306 (1886).

The opinion in *Amos* was grounded on Article XIV of the Dancing Rabbit Treaty:

"Each Choctaw head of a family desirous to remain and become a citizen of the States, shall be permitted to do so, by signifying his intention to the Agent within six months from the ratification of this Treaty, (etc.)."

This was an important concession. Unlike the later mistreatment of the Cherokees, no Choctaw had to remove himself to the Indian Territory unless he wished to do so. It was not a surprising arrangement, because the Choctaws had always lived in harmony with the white man. Their proud boast was that, unlike the nearby Chickasaws and Creeks, they had never raised their hands in war against the white man. Great chiefs, like Pushmataha, had rejected the blandishments of Tecumseh in the War of 1812 and had sent him out of the Nation into the hands of the more hospitable Creeks, the result of which, at the hands of Andrew Jackson, is well known. Moreover, the Choctaws were not nomadic. They lived in fixed habitations, cultivating corn and other crops. Thus they were identified as one of the five civilized tribes.

■ In any event, this Treaty was made by and between the Tribe and the United States and both were bound by its terms. By remaining and accepting (or claiming later, as some did) the lands allotted to those who wished to stay, the individual Indian likewise bound himself to the provisions of the Treaty.

■ The Treaty of Dancing Rabbit is a part of the Supreme Law, United States Constitution, Article 6, Clause 2, and it cannot be altered by an Act of Congress; Congress cannot obliterate the jurisdiction of Mississippi over its citizens.

This case simply does not fit into the extensive jurisprudential grooves developed with reference to Indian wards or those Indian Reservations which were established either by Treaty or created by Congress for those who never converted their Indian status to that of state citizenship.

The Leech Lake Reservation, the subject of the Supreme Court opinion in *Bryan v. Itasca County, Minnesota* [1976] —— U.S. ——, 96 S.Ct. 2102, 48 L.Ed.2d 710 was established by a Treaty, and Bryan was a duly enrolled member of the Chippewa tribe.

The Choctaw Indians of Mississippi do not live in Indian country. Except for that land patented to individual Indians under the terms of the Treaty (and not in trust) the Tribe sold all of its land to the United States in 1830. By 1850 virtually every acre of it had been patented to private purchasers by virtue of sales at the Land Offices in Columbus and Paulding. See, *DeCoteau v. District County Court for Tenth Judicial District,* 1975, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300. See also, *Dillon v. Antler Land Company of Wyola,* 9 Cir., 1974, 507 F.2d 940, *cert. denied,* 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482.

In its original brief the Department of Justice asserted:

"The Mississippi Band's reservation, held in trust for the Indians by the United States, is not under the jurisdiction of the State of Mississippi and is not subject to state tax."

We considered this to be so palpably erroneous that we proceeded in our original opinion to demonstrate our disagreement.

We must confess some bafflement with the wiggling positions taken by the government at various periods of this appeal.

In its original brief the government asserted, as above quoted, that the Mississippi Band's reservation "is not under the jurisdiction of the State of Mississippi".

In a motion to amend the opinion, filed January 28, 1975, the government argued, although it had raised the point in the first place, that it was not necessary to a decision of the case.

In the petition for rehearing, now under consideration, the government argues:

"Before leaving *McGowan* [*United States v. McGowan,* 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410] we want to clear up a misconception which, we believe, was created by our pleadings and brief. An Indian reservation is never an area of exclusive federal jurisdiction either in a practical sense or under Article I, Section 8, Clause 17 of the Constitution. Compare the opinion of the Court, 505 F.2d 633 at 641 note 2 and 643. Within an Indian reservation tribal jurisdiction and federal jurisdiction largely pre-empt state jurisdiction as to matters affecting the Tribe and its members, but state jurisdiction controls matters exclusively concerning non-Indians. For instance, a crime committed by a non-Indian against another non-Indian in Indian country is tried in state court and under state law. As a corollary state law enforcement officers have free access within Indian reservations. This is not so as to areas of exclusive federal jurisdiction. See, e. g., *New York ex rel. Ray v. Martin,* 326 U.S. 496, [66 S.Ct. 307, 90 L.Ed. 261] (1946); *Draper v. United States,* 164 U.S. 240 [17 S.Ct. 107, 41 L.Ed. 419] (1896). See also *McClanahan v. Arizona State Tax Com-mission* [411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129]. Consequently the provisions of Article I, Section 8, Clause 17 of the Constitution and the holding in *Paul v. United States,* 371 U.S. 245 [83 S.Ct. 426, 9 L.Ed.2d 292] (1963), requiring formal state consent to establishing an area of exclusive federal jurisdiction, are inapplicable to the establishment of an Indian reservation. See *United States v. McGowan, supra,* 302 U.S. at 539 [58 S.Ct. 286]."

The government argues that by reason of certain Congressional enactments beginning with May 25, 1918, eighty eight years after the Treaty, the State has lost its jurisdiction over its Choctaw Indian citizens.

An examination of the various Congressional enactments since 1918 has been a matter of considerable interest. A brief synopsis of the Legislative history of these Acts will be set forth in the Appendix to this opinion.

We take first the Act of May 25, 1918, 40 Stat. 561. This was an appropriation bill. It referred to the "full-blood Choctaw Indians of Mississippi" and to "the relief of [their] distress". The entire statute [40 Stat. at 573] reads as follows:

### MISSISSIPPI

Sec. 9. For the relief of distress among the full-blood Choctaw Indians of Mississippi, including the pay of one special agent, who shall be a physician, one farmer, and one field matron, $5,000; for their education by establishing and maintaining day schools including the purchase of land and the construction of necessary buildings, $20,000; for the purchase of lands, including improvements thereon, not exceeding eighty acres for any one family, for the use and occupancy of said Indians, to be expended under conditions to be prescribed by the Secretary of the Interior for its repayment to the United States, under such rules and regulations as he may direct, $25,000; for the purpose of encouraging industry and self-support among said Indians and to aid them in building homes, in the culture

of fruits, grains, cotton, and other crops, $25,000, which sum may be used for the purchase of seed, animals, machinery, tools, implements, and other equipment necessary, in the discretion of the Secretary of the Interior, to enable said Indians to become self-supporting, to be expended under conditions to be prescribed by the said Secretary for its repayment to the United States on or before June thirtieth, nineteen hundred and twenty-five; in all, $75,000, to be immediately available.

The Act does not refer to the Indians as a tribe, it does not mention an Indian Reservation, and it offered no help to those of less than the full blood. It was what it declared itself to be, a relief act, limited to individual Choctaws of the full blood. It required that one-third of the appropriation be repaid as directed by the Secretary of the Interior and that another one-third should be repaid by June 30, 1925. Obviously, Congress did not consider the Mississippi Choctaws as wards of the government.

It is hardly a matter of surprise, burdened like their white brethren with a hazardous one crop (cotton) economy and discriminatory freight rates which stifled industrial development, that the Indians did not pay for the lands which had been sold them out of the $25,000 appropriated for that purpose. Congress found it advisable to legislate again. It passed the Act of June 21, 1939 [53 Stat. 851]:

### AN ACT

To define the status of certain lands purchased for the Choctaw Indians, Mississippi.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That title to all lands purchased by the United States for the benefit of the Choctaw Indians of Mississippi, under authority contained in the Act of May 25, 1918 (40 Stat.L., 573), and similar subsequent Acts, not under contract for resale to Choctaw Indians, or on which existing contracts of resale may hereafter be canceled, is hereby declared to be in the United States in trust for such Choctaw Indians of one-

half or more Indian blood, resident in Mississippi, as shall be designated by the Secretary of the Interior.

Approved, June 21, 1939.

Title to the lands was "declared to be in the United States in trust for such Choctaw Indians of one-half or more Indian blood, resident in Mississippi, as shall be designated by the Secretary of the Interior". Only those individuals designated by the Secretary of the Interior were to have the benefit of this Act. Neither a tribe nor a reservation is mentioned.

This brings us to a consideration of the Act of June 18, 1934 [48 Stat. 984], upon which the government so strongly relies for the proposition that the State of Mississippi has been ousted of jurisdiction over its Indian citizens, the Treaty of Dancing Rabbit Creek to the contrary notwithstanding.

Shorn of extraneous provisions, this Act reads as follows:

That hereafter no land of any Indian reservation, created or set apart by treaty or agreement with the Indians, Act of Congress, Executive order, purchase, or otherwise, shall be allotted in severalty to any Indian.

Sec. 2. The existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are hereby extended and continued until otherwise directed by Congress.

\* \* \* \* \* \*

Sec. 5. The Secretary of the Interior is hereby authorized, in his discretion, to acquire through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments whether the allottee be living or deceased, for the purpose of providing land for Indians.

\* \* \* \* \* \*

Sec. 7. The Secretary of the Interior is hereby authorized to proclaim new Indian reservations on lands acquired pursuant to any authority conferred by this Act, or to add such lands to existing reserva-

tions: *Provided*, That lands added to existing reservations shall be designated for the exclusive use of Indians entitled by enrollment or by tribal membership to residence at such reservations.

\*    \*    \*    \*    \*    \*

Sec. 16. Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, which shall become effective when ratified by a majority vote of the adult members of the tribe, or of the adult Indians residing on such reservation, as the case may be, at a special election authorized and called by the Secretary of the Interior under such rules and regulations as he may prescribe. Such constitution and bylaws when ratified as aforesaid and approved by the Secretary of the Interior shall be revocable by an election open to the same voters and conducted in the same manner as hereinabove provided. Amendments to the constitution and bylaws may be ratified and approved by the Secretary in the same manner as the original constitution and bylaws.

In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: To employ legal counsel, the choice of counsel and fixing of fees to be subject to the approval of the Secretary of the Interior; to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State, and local Governments. The Secretary of the Interior shall advise such tribe or its tribal council of all appropriation estimates or Federal projects for the benefit of the tribe prior to the submission of such estimates to the Bureau of the Budget and the Congress.

Sec. 17. The Secretary of the Interior may, upon petition by at least one-third of the adult Indians, issue a charter of incorporation to such tribe: *Provided*, That such charter shall not become operative until ratified at a special election by a majority vote of the adult Indians living on the reservation. Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and such further powers as may be incidental to the conduct of corporate business, not inconsistent with law, but no authority shall be granted to sell, mortgage, or lease for a period exceeding ten years any of the land included in the limits of the reservation. Any charter so issued shall not be revoked or surrendered except by Act of Congress.

Sec. 18. This Act shall not apply to any reservation wherein a majority of the adult Indians, voting at a special election duly called by the Secretary of the Interior, shall vote against its application. It shall be the duty of the Secretary of the Interior, within one year after the passage and approval of this Act, to call such an election, which election shall be held by secret ballot upon thirty days' notice.

Sec. 19. The term "Indian" as used in this Act shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood. For the purposes of this Act, Eskimos and other aboriginal peoples of Alaska shall be considered Indians. The term "tribe" wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation. The words "adult Indians" wherever used in this Act shall be construed to refer to Indians who have attained the age of twenty-one years.

306

Approved, June 18, 1934.

Importantly enough, Congress expressly directed that Sections 16, 17, and 18 should not apply to the Choctaw Indian Tribe located in Oklahoma.

We again point to the specific language of Section 16: "Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize * * *".

■ We adhere to the view originally entertained that the definition of the term "Indian" appearing in Section 19 in no way altered or amended the description of those entitled to organize under the terms of Section 16.

We also adhere to the opinion that:

(1) The Choctaw Indians residing in Mississippi in 1934 were not members of an Indian tribe. The tribe was in Oklahoma. The tribal status of the Mississippi Choctaws had been permanently extinguished by the 1830 Treaty of Dancing Rabbit Creek;

■ (2) Granting that Section 7 of the 1934 Act authorized the Secretary of the Interior to set up new Indian reservations, we think that the clear intent of Congress was to legislate for Indian tribes, not for individual Indians;

(3) We see nothing in the Acts of Congress conferring authority upon the Secretary of the Interior to create Indian tribes where none had theretofore existed. Under Section 16 only a tribe could organize for self-government, etc. Additionally, we think the purpose was to give the tribes some independence from the Bureau of Indian Affairs;

■ (4) Nothing in the various Congressional enactments indicates a desire or purpose to abrogate the Dancing Rabbit Treaty;

■ (5) Nothing in the various Congressional enactments indicates a desire or purpose to oust Mississippi of its jurisdiction over those who had been its citizens, so declared by Treaty, for over a hundred years.

Consequently, we are of the opinion that the jurisdiction of the State of Mississippi over its citizens of Choctaw Indian blood stands unimpaired.

As to the dealings between the Secretary of the Interior and the United States government, on the one hand, and the Mississippi Choctaws, on the other, we do not purport to pass on their validity *vis a vis* the participants.

The Petition for Rehearing is
DENIED.

## APPENDIX

### LEGISLATIVE HISTORY

#### I

#### ACT of May 25, 1918

The proposal as to the Choctaw Indians of Mississippi was originally lost in the House on a point of order. It came back to the House in a Conference Report on House and Senate versions of the Indian Appropriations Bill.

During the original debate in the House it was shown that Congress had appropriated funds for an investigation of the condition of the Mississippi Choctaws. The report of a member of the Board of Indian Commissioners, who had made the investigation, is printed at Page 1138, Volume 56, Part 2 of the Congressional Record, Sixty Fifth Congress, Second Session. In part, the Commissioner said:

"The bulk of the Mississippi Choctaws live adjacent to the towns of Tucker, Stratton, and Union, in Neshoba and Newton Counties; in fact, practically one-half live in Neshoba County. A number live in Leake, Scott, Kemper, and Attala Counties, and there are families scattered over various other portions of the State.

\* \* \* \* \* \*

"The Choctaws of Mississippi have a very good name as regards honesty, truthfulness, cleanliness, and general morality.

\* \* \* \* \* \*

"I am not prepared to advocate a reservation for these people."

The Commissioner concluded by recommending the steps actually taken in the Act of May 25, 1918.

During the original debate in the House, Representative Ferris of Oklahoma, made the following remarks (Page 1140):

"MR. FERRIS. Mr. Chairman, the gentleman from Mississippi [MR. VENABLE] has just offered an amendment providing for the creation and establishment of a small Government agency to preside over and serve as a protectorate over some 1,100 Choctaw Indians living in Mississippi. This presents a new phase of it; it deserves attention.

"The Choctaw question is not a new one in this House. It has been debated and voted upon many times. In a word, the contention of the Mississippi delegation has always been in the past that they were entitled to share in the funds of the Oklahoma Indians, although they refused to move west and take up residence with them, and still so refuse.

"I have always opposed the adoption of the latter course and oppose it to-day. No one, either in law, equity, or good morals, I think, can justly advocate such a course.

"More than 90 years ago the Choctaw Tribe of Indians resided in the State of Mississippi. They then owned approximately 15,000,000 acres of land in Mississippi.

"By the treaty of 1820 they traded 4,000,000 acres of that land for what now comprises the Choctaw and Chickasaw Nation in the State of Oklahoma, an area in the treaty described by metes and bounds which, originally comprised what was then the Indian Territory, now a part of Oklahoma. The treaty contained a provision which provided for the removal of the Choctaws from the State of Mississippi west, leaving 10,000,000 acres of their land behind in Mississippi.

"Ten years later, in 1830, an additional treaty was entered into between the Choctaw Indians and the Federal Government, which treaty intended to more effectually carry out the provisions of the treaty of 1820, and which contains the fourteenth article, which has always been the bone of contention, and is and can be the only basis of the pretended claims of these Mississippi Indians to share in the estate of the Indians that moved west.

"The total number of Choctaws in 1830 was 18,200. Of these, 15,000 removed as per the terms of the treaty, and approximately 4,000 of them remained behind in Mississippi, refusing to abide by the treaty. These 4,000 Indians that remained in Mississippi from 1830 to 1842 had the right to take up residence and be allotted land on the 10,000,000 acres in Mississippi, and, as fast as they could be identified, were allotted and given allotments from this land.

"Only 143 families were induced to take lands from the 10,000,000 acres in Mississippi, while 3,885 for some cause refused to take allotments during the 12-year period. These 3,885 Indians who had refused to accept allotments were by the Federal Government later given land scrip to the amount of 640 acres for each and every head of the family, 320 acres for every child from 10 years of age, and 160 acres for every child under 10 years of age, one half to be delivered to them in Mississippi by the Federal Government and the other half after they removed from Mississippi to the then Indian Territory.

"The records of the Indian Office show conclusively, without any question of doubt, that this scrip was actually delivered to them and that they actually received the benefits under it.

"It can be had by consulting House Document 898, Sixty-second Congress, second session.

"The last half, or remainder, of the scrip was capitalized at $1.25 per acre and paid to these Choctaw Indians in person by the Indian agent for the Federal Government. (See muster rolls of the Indian Office and vouchers, which show precisely that the Indians first received

the land and, second, the money.) The total amount of money paid to the Indians was $872,000, which was in lieu of the last half of the scrip, which they had up to that time been unwilling to accept.

"Thus it will be observed that these Indians have received more land and more money than the Indians who obeyed the treaties, removed west, and suffered the hardships and outrages committed by the wild western tribes of Indians who then lived upon the prairies.

"In addition to this, four Secretaries of the Interior have held that they had no rights to the Indian estate in Oklahoma and that they had had their patrimony, had disposed of it, and were without any claim whatever upon the Oklahoma Indians. Four Secretaries of the Interior shared this view. The Dawes Commission shared this view. The Federal courts in the Jack Amos case adopted this view. This House has four times passed on the matter by an affirmative vote, and each time denied that they had any rights. Both House and Senate Indian Committees have repeatedly passed on it, and always held they had no rights.

"If there ever was a case of res adjudicata, this is one of them, and I assume that the Mississippi delegation have at last adopted the correct theory. However, in the face of all this, it is true that there are some 1,100 dependent Indians in the State of Mississippi without homes, without education, without employment, and without proper attention. To me there can be no great wrong in having the Federal Government, not as a matter of right but as a matter of charity, establish this agency, adopt the gentleman's amendment, and do for these dependent, helpless Indians what we are doing for other tribes in a similar condition in other States.

"There will be good men who will disagree with me about this proposition, both in and out of the Congress of the United States, both on and off the Indian Committee, but for me and mine I have always felt that the Federal Government should not allow the original occupant of the land—I mean the American soil—to go in want, his own improvidence notwithstanding."

When the Conference Report came before the House (Page 6686) Mr. Carter of Oklahoma, said:

"What do we propose to do here with reference to the Mississippi Choctaws?

"Gentlemen have said that in the past I have opposed the Mississippi Choctaw amendment. I have opposed the Mississippi Choctaws taking any part of the funds of the Choctaws in Oklahoma, because the courts, the commissions, three Secretaries of the Interior, and two Presidents had decided that they had no equitable interest in those funds. I have no apology whatever for my action with reference to this matter; and if the question ever arises again I hope I may be here on the job to prevent any such injustice and outrage being done the Choctaws in Oklahoma. What I have said with reference to the Mississippi Choctaw connection with the Federal Government is set forth in the records of this House. I quote from the report which I had the honor to assist in making as a member of a committee considering this question several years ago, as follows:

"The Federal Government, as such, is neither legally nor equitably obligated to enroll Mississippi Choctaws with the Choctaws west, and is under only such moral obligation to the Mississippi Choctaws as is due to dependent North American Indians who were originally occupants and owners of the soil, and who have been deprived of their patrimony by white settlers.

"I have no apology to make for that statement, but the gentleman from Iowa [MR. GOOD] says this $75,000 item constitutes a claim against the Federal Government. The difficulty with the gentleman is that he is unable to distinguish between a claim and a gratuity."

## II

The Act of June 21, 1939 passed the House and the Senate without comment or debate.

## III

Chairman Wheeler of the Senate explained the purpose of the Act of June 18, 1934 (Congressional Record, Seventy Third Congress, Second Session, Volume 78, Page 11,123), as follows:

"The third purpose of the bill is to stabilize the tribal organization of Indian tribes by vesting such tribal organizations with real, though limited, authority, and by prescribing conditions which must be met by such tribal organizations.

"This provision will apply only if a majority of the Indians on any Indian reservation desire this sort of organization. As a matter of fact, however, it does not change to any great extent the present tribal organization, except that when a majority of the Indians want to establish this tribal organization and extend the provisions of the bill to it, they may do so."

In the House, Mr. Howard, in charge of the bill, stated (Page 11,732):

"For the purposes of this act, section 21 defines the persons who shall be classed as Indians. In essence, it recognizes the status quo of the present reservation Indians and further includes all other persons of one-fourth or more Indian blood. The latter provision is intended to prevent persons of less than one-fourth Indian blood who are not already enrolled members of a tribe or descendants of such members living on a reservation from claiming the financial and other benefits of the act. Obviously the line must be drawn somewhere or the Government would take on impossible financial burdens in extending wardship over persons with a minor fraction of Indian blood.

\*    \*    \*    \*    \*    \*

"MR. DICKSTEIN. There have been quite a number of protests from my State in which it is stated that this bill will more or less compel them to go into the amalgamation whether they want to do so or not. Does the bill do this?

"MR. HOWARD. Under this bill no tribe of American Indians will be forced to come under its provisions unless a majority of that tribe shall by vote request to do so."