# United States Court of Appeals
## For the First Circuit

No. 03-2647

DONALD L. CARCIERI, in his capacity as
Governor of the State of Rhode Island,
STATE OF RHODE ISLAND and PROVIDENCE PLANTATIONS,
a sovereign state of the United States of America,
and TOWN OF CHARLESTOWN, RHODE ISLAND,

Plaintiffs, Appellants,

v.

GALE A NORTON, in her capacity as Secretary
of the Department of the Interior,
United States of America, and FRANKLIN KEEL,
in his capacity as Eastern Area Director of the
Bureau of Indian Affairs, within the Department of the
Interior, United States of America,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
[Hon. Mary M. Lisi, U.S. District Judge]

Before

Torruella, Circuit Judge,
Howard, Circuit Judge,
and DiClerico, Jr.,* District Judge.

Joseph S. Larisa, Jr., Assistant Solicitor for Indian Affairs,
was on brief, for appellant Town of Charlestown.
Claire J. Richards, Special Counsel, was on brief, for
appellant Governor Donald L. Carcieri.
Neil F.X. Kelly, Assistant Attorney General, with whom,

---

* Of the District of New Hampshire, sitting by designation.

Patrick C. Lynch, Attorney General, were on brief, for appellant State of Rhode Island.

Thomas L. Sansonetti, Assistant Attorney General, with whom Jeffrey Bossert Clark, Deputy Assistant Attorney General, Mary Anne Kenworthy, Office of the Solicitor, U.S. Department of the Interior, William B. Lazarus, Judith Rabinowitz, David C. Shilton and Elizabeth Ann Peterson, Attorneys, Environmental and Natural Resources Division, U.S. Department of Justice, were on brief, for the federal appellees.

Riyaz A. Kanji, with whom Kanji & Katzen, PLLC, Tracy Labin, Richard Guest, of the Native American Rights Fund, Ian Heath Gershengorn, Sam Hirsch, Jenner & Block LLP, and John Dossett of the National Congress of American Indians, were on brief, for the amici curiae National Congress of American Indians, Individual Indian Tribes, and Tribal Organizations.

Larry Long, Attorney General for the State of South Dakota, with whom John P. Guhin, Deputy Attorney General, Richard Blumenthal, Attorney General for the State of Connecticut, with whom Susan Quinn Cobb, Assistant Attorney General, Mark L. Shurtleff, Attorney General for the State of Utah, Phill Kline, Attorney General for the State of Kansas, Lawrence G. Wasden, Attorney General for the State of Idaho, Gregg D. Renkes, Attorney General for the State of Alaska, William H. Pryor, Jr., Attorney General for the State of Alabama, Jeremiah W. (Jay) Nixon, Attorney General for the State of Missouri, William H. Sorrell, Attorney General for the State of Vermont, Wayne Stenehjem, Attorney General for the State of North Dakota, were on brief, for the amici curiae States of Alabama, Alaska, Connecticut, Idaho, Kansas, Missouri, North Dakota, South Dakota, Utah and Vermont.

Stephen P. Collette, with whom Stephen P. Collette & Assocs., was on brief, for the amicus curiae National Coalition Against Gambling Expansion.

C. Bryant Rogers, with whom Roth, VanAmberg, Rogers, Ortiz & Yepa, LLP, Charles A. Hobbs, and Hobbs, Straus, Dean & Walker, LLP, were on brief, for the amicus curiae Mississippi Band of Choctaw Indians.

**REHEARING OPINION**

---

September 13, 2005

---

**TORRUELLA**, **Circuit Judge**.  This appeal arises from an administrative decision by the Secretary of the Interior to take into trust a 31-acre parcel of land located in Charlestown, Rhode Island ("the Parcel")[1] for the benefit of the Narragansett Indian Tribe of Rhode Island.  Plaintiffs-appellants Donald L. Carcieri, Governor of Rhode Island, the State of Rhode Island, and the Town of Charlestown, Rhode Island ("the State") brought suit against defendants-appellees Gale A. Norton, Secretary of the United States Department of the Interior, and Franklin Keel, Eastern Area Director, Bureau of Indian Affairs, U.S. Department of the Interior ("the Secretary") seeking to enjoin the decision as contrary to the Indian Reorganization Act, 25 U.S.C. § 461 et seq., the Rhode Island Indian Claims Settlement Act, 25 U.S.C. § 1701 et seq., the Administrative Procedures Act, 5 U.S.C. § 706, and for alleged violations of various provisions of the United States Constitution. The parties issued cross-motions for summary judgment and the district court denied the State's motion and granted the Secretary's motion.  The State now appeals the district court's grant of summary judgment in favor of the Secretary.

## I.  Background

The Narragansetts were aboriginal inhabitants of what is now Rhode Island.  See Narragansett Indian Tribe v. Nat'l Indian

---

[1]  The parcel is known as Assessor's Plat 117, Lot 119 of Charlestown, Rhode Island.

Gaming Comm'n, 158 F.3d 1335, 1336 (D.C. Cir. 1998) (citing William G. McLoughlin, Rhode Island 4-5, 9-10 (1978)). In 1975, the Narragansetts instituted two suits against the State of Rhode Island, the Town of Charlestown and individual landowners to recover 3200 acres of land in Charlestown. Narragansett Tribe of Indians v. Southern R.I. Land Dev. Corp., 418 F. Supp. 798 (D.R.I. 1976); Narragansett Tribe of Indians v. Murphy, 426 F. Supp. 132 (D.R.I. 1976). The Tribe asserted that its aboriginal title to the land had not been extinguished because each of the defendants traced his title back to an unlawful alienation of tribal land in violation of the Trade and Intercourse Act of 1790, 25 U.S.C. § 177, due to the lack of congressional approval of the sale. See S. R.I. Land Dev. Corp., 418 F. Supp. at 802-3 (recounting the history of the dispute).

**A.  The Settlement Agreement**

On February 28, 1978 the parties settled the lawsuits by entering an agreement, the terms of which were set out in a Joint Memorandum of Understanding ("JMOU") signed by the State, the Tribe, the Town and others. See State v. Narragansett Indian Tribe, 19 F.3d 685, 689 (1st Cir. 1993); H.R. Rep. No. 95-1453, at 25 (1978), reprinted in 1978 U.S.C.C.A.N. 1948. In the JMOU the State agreed to provide 900 acres of land to the Narragansetts, and the parties agreed that the federal government would provide $3.5

million for the acquisition of an additional 900 acres.[2] The resulting 1800 acres were to be held in trust for the benefit of the tribe by a state-chartered entity, the Narragansett Indian Land Management Corporation, which was created for this purpose. The parties further agreed "[t]hat Federal legislation shall be obtained that eliminates all Indian claims of any kind, whether possessory, monetary or otherwise, involving land in Rhode Island, and effectively clears the titles of landowners in Rhode Island of any such claim." JMOU para. 6; H.R. Rep. No. 95-1453, at 25, 26; see also 25 U.S.C. § 1708. In addition, the parties agreed that "except as otherwise specified in this Memorandum, all laws of the state of Rhode Island shall be in full force and effect on the Settlement Lands, including but not limited to state and local building, fire and safety codes." JMOU ¶ 13; H.R. Rep. No. 95-1453, at 26; see also 25 U.S.C. § 1708.

Subsequently, both the United States Congress and the Rhode Island General Assembly enacted the required implementing legislation. Rhode Island Indian Claims Settlement Act, 25 U.S.C. § 1701 et seq. (2000) (effective September 30, 1978) ("the Settlement Act"); R.I. Gen. Laws §§ 37-18-1 to 37-18-15 (1997) (effective 1979).

---

[2] These federal funds were authorized and appropriated in 1978 and the 900 acres of land was subsequently purchased. 25 U.S.C. §§ 1702(d), 1703, 1704, 1707, 1710 (1978).

At the time of its lawsuits, the Narragansett community was not a federally recognized tribe; rather, it was incorporated as a Rhode Island nonbusiness corporation known as the Narragansett Tribe of Indians. In 1983, the Secretary formally acknowledged the Narragansett Tribe as a federally recognized tribe. Final Determination for Federal Acknowledgment of Narragansett Indian Tribe of Rhode Island, 48 Fed. Reg. 6177 (Feb. 2, 1983).

In 1985, the State transferred the Settlement Lands to the Tribe, and the state-chartered Narragansett Indian Land Management Corporation that had held the land in trust on behalf of the tribe was dissolved. 6A R.I. Gen. Laws 37-18-12 to 18-14. Then, in 1988, following application by the Tribe, the Settlement Lands were taken into trust by the federal government pursuant to section 5 of the Indian Reorganization Act ("IRA"), enacted June 18, 1934, ch. 576, § 5, codified as 25 U.S.C. § 465 (2004). The deed transferring the Settlement Lands to the Bureau of Indian Affairs ("BIA") expressly recognized that this transfer into trust "does not alter the applicability of state law conferred by the Rhode Island Indian Land Claims Settlement Act." In addition, this court has held, with some exceptions, that the Settlement Act allows State civil and criminal jurisdiction over the Settlement Lands, although the Tribe has "concurrent jurisdiction over, and exercise[s] governmental power with respect to, those lands." Narragansett Elec. Co., 89 F.3d at 913 (quoting Rhode Island v.

<u>Narragansett Indian Tribe</u>, 19 F.3d 685, 689 (1st Cir. 1994) (holding that the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, 18 U.S.C. §§ 1166-1168, applies to the Settlement Lands)).

**B.  The Parcel**

The 31-acre Parcel that is the subject of this dispute was part of the 3200 acres that were claimed by the Tribe in the 1976 lawsuits, but the Parcel did not become part of the 1800 acres of Settlement Lands. <u>Carcieri</u> v. <u>Norton</u>, 290 F. Supp. 2d 167, 170 (D.R.I. 2003). The Parcel is adjacent to the Settlement Lands, but separated from them by a town road. <u>Id.</u> (citing <u>Narragansett Indian Tribe of R.I.</u> v. <u>Narragansett Elec. Co.</u>, 89 F.3d 908, 911 (1st Cir. 1996)). In 1991, the Parcel was purchased from a private developer by the Narragansett Indian Wetuomuck Housing Authority (the "WHA") for the purpose of constructing a housing complex. <u>Id.</u> The United States Department of Housing and Urban Development ("HUD") recognized the WHA as an Indian Housing Authority and provided the financing for the purchase of the Parcel and construction of approximately fifty housing units on the site. <u>Id.</u> The HUD funds were provided pursuant to the Indian Housing Act of 1988, 42 U.S.C. §§ 1437aa-ee, which was subsequently repealed by the Native American Housing Assistance and Self-Determination Act of 1996, Pub. L. No. 104-330, 110 Stat. 4016 (codified as 25 U.S.C. §§ 4101-4243 (2004)).

In 1992, the WHA transferred the Parcel to the Tribe with a deed restriction that the Parcel be placed in trust with the federal government for the express purpose of providing housing for tribe members. <u>Carcieri</u>, 290 F. Supp. 2d at 171 (citing <u>Narragansett Elec. Co.</u>, 89 F.3d at 911).

The Tribe and the WHA commenced construction of the housing project without obtaining a building permit from the town or the state's approval of the individual sewage disposal systems serving the project. <u>Narragansett Elec. Co.</u>, 89 F.3d at 912. As a result, the State of Rhode Island and Town of Charlestown sought injunctive relief prohibiting the Narragansetts and the WHA from constructing the housing complex without obtaining the proper permits and approvals. <u>Narragansett Indian Tribe</u> v. <u>Narragansett Elec. Co.</u>, 878 F. Supp. 349 (D.R.I. 1995). The District Court found the proposed housing project detrimental to coastal and groundwater resources, but also held that the Parcel was a "dependent Indian community" within the meaning of 18 U.S.C. § 1151 (b) and therefore denied injunctive relief. <u>Id.</u> at 355-57. On appeal this court held that the land for the housing project was not a "dependent Indian community," because it lacked federal ownership of the land and lacked federal action to "set aside" the land. <u>Narragansett Elec. Co.</u>, 89 F.3d at 914. Thus, the Parcel could not be considered Indian country under 18 U.S.C. § 1151, and therefore the housing project being constructed on the site was not

exempt from state and local building and zoning restrictions. Accordingly, this court reversed the district court and directed the district court to enter an order granting the injunction. Id. at 922.

## C.   **The Current Dispute**

The Indian Reorganization Act of 1934 authorizes the Secretary of the Interior to acquire lands in trust "for the purpose of providing land for Indians." 25 U.S.C. § 465. The Tribe initially applied to have the United States take the 31-acre Parcel into trust in 1993. However, this application was held in abeyance while the Narragansett Elec. Co. litigation was pending. In 1997, after the resolution of Narragansett Elec. Co. by this court in 1996, the Tribe submitted a second, updated application to the Eastern Area Office of the BIA requesting trust acquisition of the Parcel. On March 6, 1998, the BIA informed the Tribe of its decision to approve the Tribe's application for trust acquisition of the Parcel. Letter from Franklin Keel, Eastern Area Director, BIA, to Matthew Thomas, Chief Sachem, Narragansett Indian Tribe (Mar. 6, 1998). In April 1998, the State and Town each appealed the decision to the Interior Board of Indian Appeals (the "IBIA"). On June 29, 2000, the IBIA affirmed the BIA's decision to take the land into trust. Town of Charlestown v. E. Area Dir., Bureau of Indian Affairs, IBIA 98-88-A and 98-89-A, 35 IBIA 93 (2000).

As the district court noted, the IBIA rejected the State's and Town's challenges to several determinations made by the BIA in accepting the Parcel into trust.

> Specifically, the board concluded that the Settlement Act did not prohibit the secretary from acquiring lands other than the settlement lands into trust for the benefit of the Narragansetts. 35 IBIA 100-101. Also, the board rejected plaintiffs' argument that the BIA, either in all trust acquisition proceedings, or in view of the specific circumstances surrounding the tribe's trust application, was required to consider the possible use of the parcel for gaming purposes under the Indian Gaming Regulatory Act ("the IGRA"), 25 U.S.C. § 2701 et. seq., and to impose a restriction precluding such use. 35 IBIA at 101-103.

Carcieri, 290 F. Supp. 2d at 172. The IBIA further concluded that the BIA was not required to prepare a federal consistency determination for the proposed housing project as a prerequisite to trust acquisition of the Parcel, and therefore the BIA did not violate the Coastal Zone Management Act, 16 U.S.C. §§ 1451 et seq. 35 IBIA at 104-105.

The State then filed an action against the Secretary seeking reversal of the Secretary's decision and declaratory and injunctive relief. In a detailed opinion, the district court granted summary judgment on behalf of the Secretary, upholding the decision to take the Parcel into trust.

The State now appeals to this court. The State alleges that (1) the Secretary did not have the authority under the IRA to

acquire the land in trust for the benefit of the Narragansetts; (2) the IRA constitutes an unlawful delegation of congressional authority and offends the Enclave Clause, the Admissions Clause, and the Tenth Amendment of the Constitution; (3) the Rhode Island Indian Land Claims Settlement Act of 1978 prohibits the creation of sovereign territory for the Narragansetts in Rhode Island; and (4) the Secretary's acceptance of the Parcel into trust was arbitrary, capricious, and an abuse of discretion in violation of the APA and/or otherwise not in accordance with the law.

## II.  Analysis

A grant of summary judgment is appropriate when the evidence before the court shows that "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c)." Seaboard Surety Co. v. Greenfield Middle Sch. Bldg. Comm., 370 F.3d 215, 218 (1st Cir. 2004).  In ruling on a motion of summary judgment, a court must view "the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995) (citation omitted).  An issue is "genuine" for purposes of summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a "material fact" is one which "might affect the outcome of the suit under the governing law."  Hayes v. Douglas Dynamics, Inc., 8

-11-

F.3d 88, 90 (1st Cir. 1993) (quoting <u>Anderson</u> v. <u>Liberty Lobby,</u> <u>Inc.</u>, 447 U.S. 242, 248 (1986)).  The standards are the same where, as here, both parties have moved for summary judgment.  <u>Bientkowski</u> v. <u>Northeastern Univ.</u>, 285 F.3d 138, 140 (1st Cir. 2002) (citing Charles Alan Wright, <u>et al.</u>, <u>Federal Practice and Procedure</u> § 2720, at 335-36 (3d ed. 1998)).

We review the district court's grant of summary judgment <u>de</u> <u>novo</u>, and we may affirm the district court's decision on any sufficient ground supported by the record.  <u>Rodríguez</u> v. <u>Smithkline</u> <u>Beecham</u>, 224 F.3d 1, 5 (1st Cir. 2000).

Our review of the Secretary's decision to take the Parcel into trust is governed by § 706(2) of the Administrative Procedures Act, which provides that the reviewing court shall:

> hold unlawful and set aside agency action, findings, and conclusions found to be--
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account

> shall be taken of the rule of prejudicial
> error.

5 U.S.C. § 706(2).

## A. The Secretary's Authority to accept the Parcel into trust

The State asserts that the Secretary lacked statutory authority to take the Parcel into trust under the IRA, 25 U.S.C. § 465, because the Narragansett Indian Tribe is not entitled to the IRA's benefits. Under the IRA, "[t]he Secretary of the Interior is authorized, in his discretion, to acquire . . . any interest in lands, . . . including trust or otherwise restricted allotments . . . for the purpose of providing land for Indians." 25 U.S.C. § 465. The IRA defines the term "Indian" as:

> all persons of Indian descent who are members of <u>any recognized Indian tribe now under Federal jurisdiction</u>, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood . . . .

25 U.S.C. § 479 (emphasis added). The State argues that the term "now" in § 479 should be read as meaning "June 1934" and not "today." Thus, the state suggests that a two-prong test must be met for a tribe to be entitled to the benefits of § 465 of the IRA: unless the tribe was both (1) <u>recognized</u> and (2) <u>under federal jurisdiction</u> in 1934, the State would have us find that the Secretary is not allowed to take the State land into trust for the benefit of the tribe. Since the Narragansett Tribe was neither

-13-

federally recognized, nor under federal jurisdiction in June of 1934 when the IRA was enacted, the State argues that the Tribe is not entitled to the benefits of the IRA. We disagree, and find that the Secretary's authority under the IRA extends to the Narragansett Tribe, regardless of the status of its acknowledgment in 1934.

The Narragansett Indian Tribe was acknowledged by the Department of the Interior in 1983. In acknowledging the Narragansett Tribe, the Department stated that "the Narragansett community and its predecessors have existed autonomously since first contact, despite undergoing many modifications." Final Determination for Federal Acknowledgment of Narragansett Indian Tribe of Rhode Island, 48 Fed. Reg. 6177, 6178 (Feb. 10, 1983). Indeed, the government's formal acknowledgment noted that "[t]he tribe has a documented history dating from 1614." Id.

We find that the Department of the Interior's longstanding interpretation of the term "now" in the statute should be accorded particular deference. See North Haven Bd. of Ed. v. Bell, 456 U.S. 512, 522, n.12 (1982) ("In construing a statute, this Court normally accords great deference to the interpretation, particularly when it is longstanding, of the agency charged with the statute's administration."); NLRB v. Bell Aerospace Co., 416 U.S. 267, 274-75 (1974) ("a court may accord great weight to the longstanding interpretation placed on a statute by an agency

-14-

charged with its administration"); <u>Red Lion Broadcasting Co.</u> v. <u>FCC</u>, 395 U.S. 367, 381 (1969) ("the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong."). For seventy years the Department of the Interior has read "now" in Section 479 as meaning "today" rather than "1934." Thus, to change this reading of the statute here would impact scores of trusts created for the benefit of Indians over the last 70 years.

The State relies on two cases involving the unique circumstances of the Mississippi Choctaw Indians to support its reading of the IRA, <u>United States</u> v. <u>John</u>, 437 U.S. 634, 650 (1978); <u>United States</u> v. <u>State Tax Comm'n</u>, 505 F.2d 633, 642 (5th Cir. 1974). Neither of these cases sufficiently supports the State's conclusion.

The Mississippi Choctaws' tribal status was extinguished in 1831 by the United States Senate's ratification of the Treaty of Dancing Rabbit Creek. <u>Carcieri</u> 290 F. Supp. 2d at 180 (citing <u>State Tax Comm'n</u>, 505 F.2d at 640-43). After that time, the Choctaws did not maintain a tribal organization or manner of living. Thus, in 1934, when the IRA was enacted, "the band was not a tribe as defined by the IRA." <u>Id.</u> The Fifth Circuit therefore found that the IRA of 1934 did not include the Mississippi Choctaws, and that even a 1944 Proclamation by the Department of Interior which "purported to recognize the tribal organization of

-15-

the Mississippi Band of Choctaw Indians," could not cure the Act's omission. State Tax Comm'n, 505 F.2d at 642-43.

However, just two years later, the Supreme Court disagreed with the Fifth Circuit and held in United States v. John that the IRA of 1934 does apply to the Mississippi Choctaws. The Supreme Court's reasoning was as follows:

> The Court of Appeals and the Mississippi Supreme Court held, and the State now argues, that the 1944 proclamation had no effect because the Indian Reorganization Act of 1934 was not intended to apply to the Mississippi Choctaws. Assuming for the moment that authority for the proclamation can be found only in the 1934 Act, we find this argument unpersuasive. The 1934 Act defined "Indians" not only as "all persons of Indian descent who are members of any recognized [in 1934] tribe now under Federal jurisdiction," and their descendants who then were residing on any Indian reservation, but also as "all other persons of one-half or more Indian blood." 48 Stat. 988, 25 U.S.C. § 479 (1976 ed.). There is no doubt that persons of this description lived in Mississippi, and were recognized as such by Congress and by the Department of the Interior, at the time the Act was passed. . . . The references to the Mississippi Choctaws in the legislative history of the Act . . . confirm our view that the Mississippi Choctaws were not to be excepted from the general operation of the 1934 Act.

John, 437 U.S. at 649-50 (parenthetical in original).

In John, the Supreme Court concluded that the IRA may be invoked for the benefit of groups of Indians that were not recognized as tribes in 1934. The Court focused on the fact that, while the Choctaws were not a federally recognized tribe in

-16-

Mississippi at the time the IRA was enacted, there were individual "persons of one-half or more Indian blood" living in Mississippi at the time, and both the state and federal government recognized that the Indians were there.  Id. at 650.  This is distinctly different from the State's two-part test, which would require that an Indian tribe be both (1) recognized and (2) under federal jurisdiction at the time of the Act's passage.[3]

While the parenthetical "[in 1934]" lends support to the State's assertion that "now" should be read as "in 1934," we agree with the district court that it does not appear that the reading of this particular term in the IRA was before the Supreme Court for consideration, and the Court did not give further explanation for the inclusion of the parenthetical.

Notwithstanding the potential support found for the State's assertion in the Supreme Court's inclusion of "[in 1934]" in John, we find that Congress's recent clarification of the Indian Reorganization Act makes clear that the Secretary has the authority to extend IRA benefits to all federally recognized tribes, regardless of their acknowledgment status on the date of the IRA's enactment.  In 1994, Congress enacted the Federally Recognized Indian Tribe List Act ("List Act"), Pub. L. No. 103-454, 108 Stat.

---

[3] The land at issue in John was taken into trust between 1934 and 1944, thus, the authority for the Secretary's actions could not be justified on the basis of federal recognition, regardless of whether "now" means "in 1934" or not.

4791 (1994), which requires the Secretary of the Interior to keep a list of all federally recognized tribes, which "should reflect all of the federally recognized Indian tribes in the United States which are eligible for the special programs and services provided by the United States to Indians because of their status as Indians." Pub. L. No. 103-454, § 103. That statute, codified as 25 U.S.C. § 479a, defines the term "tribe" as "any Indian or Alaska Native tribe, band, nation, pueblo, village or community that the Secretary of the Interior acknowledges to exist as an Indian tribe." 25 U.S.C. § 479a(2). The House Report accompanying the List Act explains that federal recognition "establishes tribal status for all federal purposes." H.R. Rep. No. 103-781, at 3 (1994). Earlier the same year, Congress amended the IRA, Pub. L. No. 103-263, 108 Stat. 707, to clarify that:

> [d]epartments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 . . . with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

25 U.S.C. § 476(f), and that any such determination by a federal agency that would have the effect of discriminating among recognized tribes, "shall have no force or effect." 25 U.S.C. § 476 (g).

The federal acknowledgment regulations pursuant to which the Narragansett Tribe attained federal recognition echo these enactments. The regulations provide that "[t]he newly acknowledged tribe shall be considered a historic tribe and shall be entitled to the privileges and immunities available to other federally recognized historic tribes by virtue of their government-to-government relationship with the United States." 25 C.F.R. 83.12(a) (2004).

These statutory and regulatory provisions make clear that the Secretary's IRA authority extends to the Narragansett Indian Tribe regardless of the status of its acknowledgment in 1934. Indeed, these provisions preclude the Secretary from making the determination sought by the State, that the tribe is ineligible for the benefits of § 465 of the IRA because it was acknowledged after the enactment of the IRA. Such a determination would diminish the Tribe's privileges in relation to other federally recognized tribes, contrary to the amended IRA's plain language. 25 U.S.C. § 476(f).

**B. Constitutional Challenges to 25 U.S.C. § 465**

The State raises multiple challenges to the constitutionality of the IRA, including a charge that the authority granted to the Secretary to take land into trust is an unconstitutional delegation of congressional powers and that taking State land into trust pursuant to the IRA diminishes state

-19-

sovereignty in violation of the Tenth Amendment, the Enclave Clause, and the Admissions Clause, and exceeds Congress's authority under the Indian Commerce Clause of the Constitution.

### 1. The Nondelegation Doctrine

The State contends that § 465 of the IRA is an unconstitutional delegation of legislative power to the Secretary of the Interior because the only limitation it places on the Secretary's trust-taking authority is that the trust acquisition must be "for the purpose of providing land for Indians." 25 U.S.C. § 465. Thus, the State argues, Congress failed to articulate sufficient standards to guide the Secretary's trust determinations.

Article I, Section I, of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." The Supreme Court has repeatedly said that "when Congress confers decisionmaking authority upon agencies Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" Whitman v. Am. Trucking Ass'ns, Inc., 531 U.S. 457, 472 (2001) (quoting J.W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 409 (1928)). The State contends that § 465 lacks the required "intelligible principle."

The statute provides that:

The Secretary of the Interior is authorized, in his discretion, to acquire, through

-20-

purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.

For the acquisition of such lands . . ., there is authorized to be appropriated, . . . a sum not to exceed $2,000,000 in any one fiscal year: Provided, That no part of such funds shall be used to acquire additional land outside of the exterior boundaries of Navajo Indian Reservation for the Navajo Indians in Arizona, nor in New Mexico, in the event that legislation to define the exterior boundaries of the Navajo Indian Reservation in New Mexico . . . becomes law.
. . .
Title to any lands or rights acquired pursuant to this Act or the Act of July 28, 1955 (69 Stat. 392), as amended (25 U.S.C. 608 et seq.) Shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

25 U.S.C. § 465.

To support its nondelegation doctrine argument, the State relies on an Eighth Circuit decision, ultimately vacated by the Supreme Court, that found § 465 to be a standardless delegation with so few "boundaries," or "intelligible principles," that "it would permit the Secretary to purchase the Empire State Building in trust for a tribal chieftain as a wedding present." South Dakota v. United States Dept. of Interior, 69 F.3d 878, 882 (8th Cir. 1995), vacated by 519 U.S. 919 (1996). As the district court noted, the Supreme Court chose not to publish an opinion explaining

-21-

the majority's reasoning for vacating the Eighth Circuit opinion. Therefore the vacated decision has no precedential value and we will not rely on it here.

The Tenth Circuit addressed the validity of Congress' delegation of trust acquisition authority under § 465 in United States v. Roberts, 185 F.3d 1125 (10th Cir. 1999). In Roberts, the Tenth Circuit held that Congress properly delegated authority to the Secretary of the Interior to acquire land in trust for Indians. Id. at 1137. The Tenth Circuit found that the statute itself provides standards for the Secretary's exercise of discretion and noted that it had previously acknowledged that the statute places limits on the Secretary's discretion. See McAlpine v. United States, 112 F.3d 1429, 1432 n.3 (10th Cir. 1997)(citing South Dakota, 69 F.3d at 887-88 (Murphy, J. dissenting)). For example, "the statute provides any land must be acquired for Indians as defined in 25 U.S.C. § 479 and funds appropriated for the acquisitions may not be used to provide land for Navajos outside their reservation boundaries." Roberts, 185 F.3d at 1137 (citations omitted). In addition, "the legislative history identifies goals of 'rehabilitating the Indian's economic life' and 'developing the initiative destroyed by . . . oppression and paternalism,' of the prior allotment policy and indicates the Secretary must assure continued 'beneficial use by the Indian occupant and his heirs.'" Id. (citations omitted). We agree with

-22-

the district court's conclusion that the reasoning in <u>Roberts</u> is persuasive, and we find, for the same reasons articulated in <u>Roberts</u>, that § 465 is not an unconstitutional delegation of legislative power.  <u>Id.</u>

### 2.  The Tenth Amendment and the Indian Commerce Clause

The State contends that § 465 of the IRA offends the Tenth Amendment by generally encroaching on state sovereignty and that Congress's Article I Indian Commerce Clause authority does not extend to the abrogation of state sovereignty.  We agree with the conclusion of the district court that this argument fails.

Congress' authority to regulate Indian affairs is clearly within the enumerated powers of the federal government.  <u>See</u> U.S. Const. art. I., § 8, cl. 3 (conferring upon Congress the power "[t]o regulate commerce . . . with the Indian tribes."); <u>see also</u> <u>Morton</u> v. <u>Mancari</u>, 417 U.S. 535, 551 (1974) (noting that Congress has plenary power "to deal with the special problems of Indians," including the power to legislate).  The Tenth Amendment reserves to the States, or the People, those powers not delegated to the United States by the Constitution.  The Supreme Court has interpreted the Tenth Amendment to be a mirror of the enumerated powers embodied in Article I.  <u>New York</u> v. <u>United States</u>, 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States").  Therefore, because the power to regulate Indian

-23-

affairs is conferred on Congress, its exercise does not offend the Tenth Amendment.

### 3. The Enclave Clause

The State claims that the Federal government may not acquire lands to be held in trust for the benefit of an Indian tribe unless it has secured the consent of the State pursuant to the Enclave Clause of the Constitution. U.S. Const. art. I, § 8, cl. 17. The Enclave Clause provides Congress with the power to exercise "exclusive legislative" authority "over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." Id. This was intended to ensure that the "places on which the security of the entire Union may depend" would not "be in any degree dependent on a particular member of it." Fort Leavenworth R.R. Co. v. Lowe, 114 U.S. 525, 530 (1885).

Indian reservations, however, are not federal enclaves, and instead represent land owned by the United States for public purposes. "Such ownership and use without more do not withdraw the lands from the jurisdiction of the state," Surplus Trading Co. v. Cook, 281 U.S. 647, 650 (1930), and State consent is therefore not required. The Supreme Court recently confirmed that lands held in trust for the benefit of tribes are not subject to the exclusive jurisdiction of the United States:

> Our cases make clear that the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. State sovereignty does not end at a reservation's border. Though tribes are often referred to as "sovereign" entities, it was "long ago" that "the Court departed from Chief Justice Marshall's view that 'the laws of [a State] can have no force' within reservation boundaries.

Nevada v. Hicks, 533 U.S. 353, 361 (2001) (quoting Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 561 (1832)); see also Surplus Trading Co., 281 U.S. at 651 (holding the Indian reservation out as an example of land owned by the United States that does not constitute a federal enclave because the civil and criminal laws still have partial application therein).  Therefore, we find that the Secretary's acquisition of the Parcel into trust does not violate the Enclave Clause.

### 4.  The Admissions Clause

The State also contends that the trust acquisition of the Parcel offends the Admissions Clause of the Constitution.  U.S. Const. art. IV, § 3, cl. 1.  The Admissions Clause provides: "New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; . . . or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress." Id.

The trust acquisition, however, does not amount to the establishment of a new state within the meaning of the Admissions Clause. For purposes of the Admissions Clause, "state" refers to a body equal in power to the existing states. Coyle v. Smith, 221 U.S. 559, 566-67 (1911) (quoting U.S. Const. art. IV, § 3, cl. 1.). The Supreme Court, in Coyle interpreted that "'[t]his Union' was and is a union of States, equal in power, dignity, and authority," Coyle, 221 U.S. at 567, and that Congress does not have the "power to admit a new state which shall be any less a state than those which compose the Union." Id. at 568. Since the trust acquisition does not confer statehood status, it does not offend the Admissions Clause.

## C. The Rhode Island Indian Claims Settlement Act

We now turn to the State's argument that the Rhode Island Indian Claims Settlement Act prohibits the Secretary from converting the Parcel into an unrestricted federal trust.[4] The State offers several arguments in support of its position. First, the State argues that allowing the Secretary to take non-Settlement Lands into trust for the Tribe disrupts the special balance of

---

[4] When the Secretary takes land into trust for the use of Indians pursuant to the IRA of 1934, the land is held under the superintendence of the Federal Government and is ordinarily exempt from certain state laws, including "(1) state or local taxation, see 25 U.S.C. § 465; (2) local zoning and regulatory requirements, see 25 C.F.R. § 1.4(a); or, (3) state criminal and civil jurisdiction, unless the tribe consents to such jurisdiction, see 25 U.S.C. §§ 1321(a), 1322(a)." Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior, 228 F.3d 82, 85-86 (2d Cir. 2000).

rights and allocation of powers between the State, the Federal Government, and the Tribe that were negotiated by the parties, laid out in the JMOU and then implemented through the Settlement Act. Thus, the State asserts that the Settlement Act precludes the Tribe, and any "successor in interest" -- here meaning the Secretary -- from disrupting this allocation by acquiring additional, non-settlement lands into trust and thereby removing them from the jurisdiction and laws of the State. Second, the State contends that § 1707(c), as well as portions of § 1705(a)(3) and § 1712(a)(3) of the Settlement Act, eliminate the federal government's ability to divest state sovereignty by acquiring land into trust for the Tribe. Third, the State argues that the 1976 lawsuits settled the State's jurisdiction over the 3200 acres at issue in those suits, and thus the 31-acre Parcel, which was a part of the 3200 acres of contested lands, may not be accepted into trust by the Secretary. Finally, the State argues in the alternative that, regardless of whether the Parcel may be taken into trust, the Settlement Act prohibits the Tribe and the Federal government from making a claim that the Tribe's laws, rather than the criminal and civil laws of the State of Rhode Island, should apply on Tribal land.

The Secretary responds that the Settlement Act does not prohibit the Settlement Lands from being acquired into trust, and argues that the Act addresses the extinguishment of Indian

aboriginal land claims in Rhode Island without prohibiting future land transactions. We agree that the Settlement Act does not prohibit the Parcel from being taken into trust by the Secretary, and we hold that the trust may be "unrestricted," thus removing the land from the criminal and civil jurisdiction of Rhode Island.

The issue here is primarily one of statutory construction. Does the Settlement Act preclude the Secretary from taking land, in addition to the Settlement Lands, into trust on behalf of the Tribe? Does the Settlement Act prohibit the Secretary from removing lands not included in the Settlement Lands from under the laws and jurisdiction of the State of Rhode Island? The Supreme Court has said that "statutes are to be construed liberally in favor of the Indians with ambiguous provisions interpreted to their benefit." Chickasaw Nation v. United States, 534 U.S. 84, 93-94 (2001).

The Rhode Island Indian Claims Settlement Act, in provisions pertinent to these questions -- including 25 U.S.C. § 1705 (Publication of findings), 25 U.S.C. § 1712 (Approval of prior transfers and extinguishment of claims and aboriginal title outside town of Charlestown), and 25 U.S.C. § 1707 (Purchase and transfer of private Settlement Lands) -- provides for the ratification of various transfers of land and natural resources, extinguishment of aboriginal title, state jurisdiction over the Settlement Lands, and a limit on the duties and liabilities of the

-28-

federal government with respect to the settlement.  Specifically, the Settlement Act ratified any transfer of land or natural resources located anywhere in the United States made by, or on behalf of, the Narragansetts, their predecessors, or their successors as congressionally approved as of the date of the transfer.  25 U.S.C. § 1705(a)(1).  The Act also provided for ratification of any transfers of land or resources located within the town of Charlestown, id., as well as anywhere else within the State of Rhode Island, 25 U.S.C. § 1712(a)(1), that were made by any Indian, Indian nation, or Indian tribe.  The Act extinguished any Indian claims of aboriginal title to all such property as of the date of the transfer.  25 U.S.C. §§ 1705(a)(2), 1712(a)(2).

The Settlement Act also provided that:

> by virtue of the approval of a transfer of land or natural resources effected by this section, or an extinguishment of aboriginal title effected thereby, all claims against the United States, any State or subdivision thereof, or any other person or entity, by the Indian Corporation or any other entity presently or at any time in the past known as the Narragansett Tribe of Indians, or any predecessor or successor in interest, member or stockholder thereof, or any other Indian, Indian nation, or tribe of Indians, arising subsequent to the transfer and based upon any interest in or right involving such land or natural resources (including but not limited to claims for trespass damages or claims for use and occupancy) shall be regarded as extinguished as of the date of the transfer.

25 U.S.C. § 1705(a)(3).  In § 1712(a)(3), the Act effected the same extinguishment of all claims by any other tribe of Indians based

-29-

upon any interest in, or rights involving, land or resources transferred anywhere within Rhode Island.

### 1. Whether the Settlement Act precludes trust acquisition

The State argues that § 1705 and § 1712 of the Settlement Act provide a comprehensive extinguishment of the ability of any tribe, including the Narragansetts, to claim territorial sovereignty anywhere in the State of Rhode Island through a two-pronged approach of first, terminating all aboriginal title throughout Rhode Island, 25 U.S.C. §§ 1705(a)(2), 1712(a)(2), and, second, extinguishing any claims by any tribe, or successor in interest, against the State based upon "any interest in or right involving land" in Rhode Island, 25 U.S.C. §§ 1705(a)(3), 1712(a)(3). The State also contends that the extinguishment of the right of "any successor in interest" in § 1705(a)(3) and § 1712(a)(3) precludes the Secretary from making the same claim on the Tribe's behalf. These provisions, the State asserts, are the result of the careful balance that was negotiated in the settlement of the 1976 lawsuits. Whereas the Narragansett tribe received an 1800-acre land base and locus for the exercise of its retained sovereignty over its members and internal tribal matters, see Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 701 (1st Cir. 1994), the State obtained the continued application of its laws and jurisdiction on the Settlement Lands, 25 U.S.C. § 1708(a) ("Except as otherwise provided in this subchapter, the Settlement Lands

-30-

shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island."). The State argues that the Secretary's action of taking the Parcel into trust, thereby removing it from the jurisdiction of the State's criminal and civil laws, upsets this negotiated and agreed-upon balance, as implemented by the Settlement Act.

These sections of the Settlement Act show that Congress intended to enact a wide-reaching resolution of any and all contested transfers of land by Indians qua Indians in Rhode Island. The JMOU and Settlement Act clearly resolve all prior contested land transfers and related claims involving Indian tribes, including the extinguishment of aboriginal title in Rhode Island.

It is not clear, however, that Congress intended to preclude the Narragansetts from ever expanding from the Settlement Lands if the Tribe became federally recognized. Neither the JMOU nor the Settlement Act provides that lands outside the Settlement Lands may not be acquired or held in trust. In fact, the JMOU and Settlement Act do not make direct reference to the IRA at all. The omission of an explicit prohibition on trust acquisition and federal superintendence of non-Settlement lands is significant, because settlement acts resolving Indian claims in other states did explicitly prohibit future trust acquisitions. See, e.g., 25 U.S.C. § 1724(e) (precluding application of § 465 of the IRA in the Maine Settlement Act); Connecticut ex rel. Blumenthal, 228 F.3d at

90 (finding that the absence of a provision analogous to the prohibition of § 465 of the IRA in the Maine Settlement Act confirmed "that the Settlement Act was not meant to eliminate the Secretary's power under the IRA to take land purchased without settlement funds into trust for the benefit of the Tribe").

The Settlement Act explicitly anticipated that the Narragansetts might eventually be federally acknowledged, 25 U.S.C. § 1707(c), and the JMOU provided that the Narragansett Tribe would "have the same right to petition for [federal] recognition and services as other groups." JMOU para. 15, H.R. Rep. No. 95-1453, at 27. As we noted, one of the benefits of federal recognition is the right to apply to have land taken into trust by the federal government for the benefit of the tribe, pursuant to Section 5 of the IRA.

At the time the JMOU was negotiated and the Settlement Act was enacted, the Narragansetts had not yet been acknowledged as a federally recognized tribe. Thus, they were ineligible at that time to apply for the benefits of the IRA, including the acquisition of land into trust by the Secretary of the Interior for their use. As we noted above, trust acquisition typically results in the removal of the land from State jurisdiction in favor of tribal jurisdiction with federal superintendence. Therefore, the immediate result of § 1708 was indeed that the laws and jurisdiction of the State would remain in force throughout the

state at the time of the JMOU and enactment of the Settlement Act. Once the tribe received federal recognition in 1983, however, it gained the same benefits as other tribes, including the right to apply to have land taken into trust pursuant to § 465 of the IRA.

### 2. The Secretary's duties and liabilities under the Settlement Act

The Settlement Act provides that "[u]pon the discharge of the Secretary's duties under §§ 1704-1706, and 1707 of this title, the United States shall have no further duties or liabilities under this subchapter with respect to the Indian Corporation or its successor, the State Corporation, or the settlement lands . . . ." 25 U.S.C. § 1707(c). The State contends that this passage prohibits the federal government from divesting the State of sovereignty over the Parcel by putting the land into trust for the Tribe.

However, § 1707(c) does not preclude the Secretary from acquiring additional lands in trust for the benefit of the Narragansetts. Again, we point out that the Narragansetts did not obtain federal acknowledgment of their tribal status until 1983. Despite the fact that the JMOU and Settlement Act both contemplated the future acknowledgment of the Narragansett tribe by the federal government, no explicit limitation was placed on the Secretary's authority to accept additional land into trust for the Narragansetts' benefit. Cf. Maine Indian Claims Settlement Act, 25 U.S.C. § 1724 (e) ("Except for the provisions of this

-33-

subchapter, the United States shall have no other authority to acquire lands or natural resources in trust for the benefit of Indians . . . in the State of Maine."). We therefore agree with the district court that such a restriction cannot reasonably be inferred. Carcieri, 290 F. Supp. 2d at 184.

### 3. Settlement of the 1976 Lawsuits

The State argues that the trust acquisition of the Parcel is precluded by the doctrine of res judicata because the Parcel was among the 3200 acres at issue in the 1976 lawsuits that were ultimately settled by the JMOU and implementation of the Settlement Act. The Parcel was part of the 1400 acres that remained with the defendant property owners pursuant to the settlement. Thus, the State contends that the Tribe relinquished its claimed interest in the exercise of sovereignty over the 1400 acres, including the 31-acre Parcel.

This argument is without merit. As the district court noted, "the doctrine of res judicata operates to bar the relitigation of issues that were or could have been raised in an earlier action between the same parties prescinding from the same set of operative facts." Id. at 186 (quoting In re Carvalho, 335 F.3d 45, 49 (1st Cir. 2003)) (citations omitted). Since the federal government was not a party to the 1976 lawsuits or the JMOU, the principles of res judicata do not apply. The State attempts to salvage the argument on appeal by contending that the

United States maintains a special relationship with the Tribe such that they may be considered a legal unity. This argument is ultimately insufficient because the fee-to-trust acquisition of the Parcel by the Secretary, and the consequences thereof, are different issues than the claims of aboriginal right which were litigated in the 1976 lawsuits and resolved by the JMOU and Settlement Act. Accordingly, even if there were a substantial identity of the parties in the 1976 and the instant litigation, there would be no identity of claims, and thus, the trust acquisition is not barred by res judicata.

### 4. The State's alternative argument

Finally, the State argues that even if the Settlement Act can be read to allow the Secretary to take the Parcel into trust for the Narragansetts, the trust must remain subject to the State's civil and criminal jurisdiction in order to comply with the Settlement Act, which extinguished aboriginal title throughout Rhode Island, 25 U.S.C. §§ 1705(a)(2); 1712(a)(2), as well as Indian claims against the State based upon "any interest in or right involving" land in Rhode Island, id. §§ 1705(a)(3); 1712(a)(3). For many of the same reasons we determined that the Settlement Act does not prohibit the Secretary from acquiring the Parcel into trust, we find that the trust need not be restricted to preserve the State's jurisdiction. Although the Settlement Act expressly provides that the 1800 acres of Settlement Lands must

remain subject to the State's jurisdiction, 25 U.S.C. § 1708(a), neither the Act nor the JMOU prohibits the Tribe from expanding on its lands or from taking advantage of the benefits associated with federal recognition, which include the trust acquisitions and federal superintendence.

The State suggests that the Settlement Act's extinguishment of all aboriginal title in 25 U.S.C. §§ 1705(a)(2) and § 1712(a)(2) "necessarily implies" that the State's laws and jurisdiction are preserved everywhere else in the State. While that may have been true before the Narragansett Tribe was recognized by the federal government and became eligible for federal benefits, it is no longer the case today. As we note above, the JMOU specifically provided that although the Narragansett Tribe would "not receive federal recognition for purposes of eligibility for Department of the Interior services as a result of congressional implementation of . . . this memorandum, [] it will have the same right to petition for such recognition and services as other groups." JMOU at para. 15; H.R. Rep. No. 95-1453 at 27.

The State argues that the extinguishment of aboriginal title expressly eliminates tribal territorial sovereignty. To support this assertion, the State points to two cases. First, the State cites Bates v. Clark, 95 U.S. 204, 207-08 (1877), for the proposition that the extinguishment of aboriginal title eliminates

Indian country. We decline to rely on Bates, because the case predates the IRA of 1934, as well as modern Supreme Court case law defining Indian country, and the statutory definition of "Indian country" that ratified that case law in 18 U.S.C. § 1151.[5] The second case the State cites is a Supreme Court case reversing a Ninth Circuit holding that the Native Village of Venetie was "Indian country," and citing with approval the concurrence of one Ninth Circuit judge, who viewed the broad extinguishment of aboriginal title in the Alaska Native Claims Settlement Act (ANCSA) as leaving Native Alaskans as sovereigns "without territorial

_____

[5] Congress defines "Indian country" as:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151.

At issue in this case is whether the Parcel is a "dependent Indian community" as defined in § 1151(b) of the statute. The Supreme Court has held that "a federal set-aside and a federal superintendence requirement must be satisfied for a finding of a 'dependent Indian community.'" Alaska v. Native Village of Venetie Tribal Gov't, 522 U.S. 520, 530 (1998). If the Parcel may be taken into unrestricted trust, it will be "Indian country" because (1) the land will be "set-aside" by the Federal Government and occupied by an Indian community, and (2) the community will be "dependent" on the Federal Government in the sense that "the Federal Government and the [Narragansetts], rather than the State[], [will] exercise primary jurisdiction over the land. . . ." Id.

-37-

reach." Native Village of Venetie, 522 U.S. at 526. The situation concerning the land owned by the Native Village of Venetie, however, is different from the issue here. In enacting ANCSA, Congress stated that settlement of the Alaskan land claims was to be accomplished "without creating a reservation system or lengthy wardship or trusteeship." 43 U.S.C. § 1601(b). To that end, ANCSA actually revoked the reservations that had previously been set aside for Alaskan natives, including the Native Village of Venetie's reservation. It was as a result of this revocation that the land ceased to be Indian country, not the extinguishment of aboriginal title.

Extinguishing aboriginal title merely terminates the right of Indian nations to occupy their ancestral lands. It is a right of occupancy and use. See County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 234 (1985); Narragansett Tribe of Rhode Island v. Narragansett Elec. Co., 89 F.3d 908, 914 (1st Cir. 1996) ("Aboriginal title . . . is the right of Indian tribes to use and occupy lands they had inhabited from time immemorial.") (internal quotation marks and citations omitted).

It is not necessary that a federally recognized tribe have aboriginal title to land it owns in fee simple for the tribe to request that the Secretary of the Interior take land into trust pursuant to § 465 of the IRA. The Narragansetts did not assert their aboriginal title to the Parcel when they petitioned the

Federal Government to take the land into trust, as the State suggests.[6] Rather, they exercised their statutory privilege to make the request, pursuant to the IRA, and the Secretary had discretionary authority to determine whether to grant that request.

The State incorrectly construes a recent Supreme Court decision, City of Sherill v. Oneida Indian Nation, 544 U.S. ---, 125 S. Ct. 1478 (2005), in an attempt to buttress its interpretation. City of Sherill involved an attempt by the Oneidas to unilaterally reassert their sovereignty over lands they purchased in fee simple. The Oneidas argued that they had "unified fee and aboriginal title and may now assert sovereign dominion over the parcels." Id. at 1481. The Supreme Court responded that "[t]he Oneidas long ago relinquished the reins of government and cannot regain them through open-market purchases from current titleholders." Id. at 1483. The Narragansetts, on the other hand, attempted to do nothing of the sort. Rather, the Narragansetts used the precise mechanism the Supreme Court stated that the Oneidas should have used: application for trust acquisition of the land pursuant to § 465. Id. at 20-21.

The State also claims that converting the Parcel to unrestricted trust is incompatible with the second extinguishment prong of the Settlement Act: the extinguishment of any claims by

---

[6] Assertion of any aboriginal title by the Narragansetts would clearly have been impossible because the tribe's aboriginal title was extinguished by the Settlement Act. 25 U.S.C. §§ 1705, 1712.

any tribe, including the Narragansetts, or any "successor in interest," against the State or the Town based upon "any interest in or right involving" land in Rhode Island. 25 U.S.C. §§ 1705 (a)(3); 1712(a)(3). The State claims that converting the Parcel into unrestricted trust will render this latter prong mere surplusage. We disagree.

We note two things that the State fails to mention. First, aboriginal title may form the basis not only of claims for possession or damages, but also for trespass or other subsidiary claims. See H.R. Rep. No. 95-1453, at 8. Thus, there is no basis for the State's surplusage argument. Second, the full language of § 1705(a)(3) provides that:

> by virtue of the approval of a transfer of land or natural resources effected by this section [meaning transfers by the Narragansett tribe or any predecessor or successor in interest], or an extinguishment of aboriginal title effected thereby, all claims against the United States, any State or subdivision thereof, or any other person or entity, by the Indian Corporation or any other entity presently or at any time in the past known as the Narragansett Tribe of Indians, or any predecessor or successor in interest, member or stockholder thereof, or any other Indian, Indian nation, or tribe of Indians, arising subsequent to the transfer and based upon any interest in or right involving such land or natural resources (including but not limited to claims for trespass damages or claims for use and occupancy) shall be regarded as extinguished as of the date of the transfer.

25 U.S.C. § 1705(a)(3) (emphases added). This language suggests that Congress intended to extinguish all claims that could arise as

-40-

a result of transfers of land by the Narragansetts, many of which were made in violation of the Nonintercourse Act, or claims that the Narragansetts might have had by virtue of their aboriginal title prior to extinguishment. In other words, the terms of the extinguishment provisions may reasonably be interpreted as extinguishing Indian land claims based exclusively on the possessory rights that gave rise to the Narragansetts' lawsuits.

We also note that the primary purpose of the Settlement Act and the JMOU it implemented was not to preserve Rhode Island's jurisdiction, but rather, it was to clear the cloud that had developed on the title to thousands of acres of lands to which the Narragansett Tribe had made legal claims seeking possession pursuant to aboriginal title. See H.R. Rep. 95-1453 at *6 ("[T]he pendency of the lawsuits resulted in economic hardship for the residents of Charlestown by clouding titles to most of the land within the town."). "In return for the public and private settlement lands under the Settlement Agreement, the Narragansetts agreed to cause their lawsuits to be dismissed with prejudice and consented to the extinguishment by the Federal Government of all Indian claims for possession of land (and all potential damages based on their land claims) within Rhode Island, which would clear non-Indian title to non-settlement lands claimed by the tribe." Id. at *7 (emphases added).

-41-

Moreover, even assuming the Settlement Act's provisions created an ambiguity as to whether the Narragansett Tribe would be eligible for the benefit of unrestricted trust acquisition of land upon federal recognition, we adhere to the canon of statutory construction that statutes "are to be construed liberally in favor of the Indians with ambiguous provisions interpreted to their benefit." See Chickasaw Nation, 534 U.S. at 93-94. "'In determining [congressional] intent, we are cautioned to follow the general rule that doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.'" Connecticut ex rel. Blumenthal, 228 F.3d at 92 (quoting Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 586 (1977).

Accordingly, we hold that the Secretary of the Interior is not prohibited by the Settlement Act from taking the Parcel into unrestricted trust.[7]

---

[7] The dissent remarks that our holding -- that the Parcel may be taken into unrestricted trust -- "produces an unwarranted anomalous relationship between the Settlement Lands and the after acquired parcel." We note, however, that this relationship is not unprecedented. In Connecticut ex rel. Blumenthal, the Second Circuit rejected the State of Connecticut's argument that the Secretary of the Interior should not be allowed to take additional, non-settlement land into trust pursuant to the IRA on behalf of the Mashantucket Pequot Tribe because it would create a "checkerboard" jurisdiction. 228 F.3d at 90 (stating that "the possibility of heterogeneous jurisdictional areas within the [Tribe's] lands does not compel a different result"); see also Washington v. Confederated Bands & Tribes of the Yakima Indian Nation, 439 U.S. 463, 502 (1979) ("In short, checkerboard jurisdiction is not novel in Indian law.").

**D. Whether the Secretary's acceptance of the Parcel in trust violates the APA**

In addition to the constitutional and other statutory challenges to the Secretary's decision to take the Parcel into trust, the State claims that the Secretary's action was an abuse of discretion under the Administrative Procedures Act. Our review of the Secretary's decision is governed by § 706(2)(A) of the APA, which provides that a court may set aside agency action only where it finds the action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). An agency's determination is arbitrary and capricious if the agency lacks a rational basis for making the determination or if the decision was not based on consideration of the relevant factors. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. 29, 43 (1983); Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997). The Court's review under § 706(2)(A) is highly deferential, and the Secretary's action is presumed to be valid. See Conservation Law Found. of New England, Inc. v. Sec'y of Interior, 864 F.2d 954, 957-58 (1st Cir. 1989). A reviewing court cannot substitute its own judgment for that of the agency. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971); Associated Fisheries, 127 F.3d at 109. We will apply the same legal standards that governed the district court's review, without affording special deference to that court's decision.

The State makes five arguments as to why the Secretary's decision was unlawful under § 706(2)(A), including that (1) the BIA relied on the Tribe's findings, rather than conducting an independent evaluation of the Tribe's application, (2) the BIA misapplied the factors enumerated in 25 C.F.R. § 151.10 for evaluating a fee-to-trust transfer, (3) the Native American Housing and Self Determination Act ("NAHASDA") cooperation agreement waiver violated due process, (4) the BIA failed to consider environmental impacts of the housing project planned for the Parcel, and (5) the BIA failed to consider noncompliance with the Coastal Zone Management Act ("CZMA") and the Indian Gaming Regulatory Act ("IGRA"). We disagree with the State, and for essentially the same reasons as set forth in the district court's decision, we find that the Secretary's decision to accept the Parcel into trust did not violate the APA.

### 1. Whether the BIA failed to conduct an independent evaluation of the Tribe's trust application

The State points to substantial passages in the Secretary's decision, which contain verbatim restatements of information provided by the Narragansett Tribe in support of their 1993 trust application, as evidence that the BIA failed to conduct an independent evaluation of the Tribe's 1997 application. The State claims that the BIA relied exclusively on the Tribe's assertions and failed to consider other important facts that occurred between 1993 and 1997. Thus, the State asserts that the

-44-

BIA made an arbitrary and capricious decision and abused its discretion.

However, there is ample evidence in the administrative record that the BIA conducted its own, independent evaluation of the Tribe's application and that it considered the events following the Tribe's 1993 application. For example, between 1993 and 1997, the BIA required the Tribe to supplement its initial Environmental Assessment; conducted an environmental hazard survey of the subject 31-acre Parcel (Supp. App. 99); required confirmation of consistency with the State's Coastal Resources Management Plan (Supp. App. 102-03); was well aware of the Narragansett Electric litigation (Supp. App. 10-12, 13-93); was apprised of, and offered to facilitate, negotiations between the Tribe, the Town, and the State concerning both environmental and jurisdictional issues attendant to the Tribe's development of the Parcel (Supp. App. 1); and specifically requested that the Regional Solicitor address several legal and jurisdictional issues raised by the State in its comments to the BIA on the Tribe's trust application (Supp. App. 101). This shows that the BIA did not rely solely on the findings of the Tribe and did conduct its own evaluation. We agree with the district court's finding that the BIA's determination was the result of its own, independent evaluation of the 1997 application.

### 2. Whether the BIA properly applied the 25 C.F.R. § 151.10 factors

The State claims that the BIA failed to apply the proper criteria when it evaluated the Tribe's application for trust acquisition. The regulations governing the BIA's evaluation of applications to have land taken in trust are laid out at 25 C.F.R. § 151. The factors to be considered for an "on-reservation" acquisition are found in § 151.10 and the factors for an "off-reservation" acquisition are in § 151.11. In making the decision to accept the Parcel into trust, the BIA considered the on-reservation factors in § 151.10,[8] which include:

> (a) The existence of statutory authority for the acquisition and any limitations contained in such authority;
> (b) The need of the individual Indian or the tribe for additional land;
> (c) The purposes for which the land will be used;
> . . .
> (e) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;

---

[8] For the purpose of 25 C.F.R. § 151, land is considered to be "on-reservation" if it is "located within or contiguous to an Indian reservation," and "off-reservation" where "the land is located outside of and noncontiguous to the tribe's reservation." The State challenges the finding by the BIA and district court that the Parcel is adjacent to Settlement Lands, yet recognizes that this determination is insignificant to the application of either section in this case, as the sections differ only slightly. Compare § 151.10 with § 151.11. As we have previously noted, the Parcel is adjacent to the Settlement Lands, but separated from them by a town road. Narragansett Elec. Co., 89 F.3d at 911.

(f) Jurisdictional problems and potential conflicts of land use which may arise; and
(g) If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.
. . .

25 C.F.R. § 151.10.

The State claims that the BIA failed to consider "the need of . . . the tribe for additional land," § 151.10(b). The State also questions whether the BIA sufficiently scrutinized "the tribe's justification of anticipated benefits from the acquisition" as required by § 151.11(b). The criteria required pursuant to § 151.11(b) are as follows:

> The location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation, shall be considered as follows: as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition. . . .

25 C.F.R. § 151.11(b).

As we have noted, a reviewing court will determine only "whether the [BIA's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." See Citizens to Preserve Overton Park, 401 U.S. at 416. The fact that the BIA found the Parcel, which is across a town road from the Settlement Lands, to be "contiguous" to the Settlement Lands that are currently in trust, and thus determined that it

-47-

should consider the "on-reservation" factors enumerated in 25 C.F.R. § 151.10, is certainly not clear error and is within the Secretary's discretion. It was not necessary for the BIA to consider the factors under § 151.11, since it found § 151.10 to be applicable for this trust determination. While the Secretary need not consider § 151.11(b), we note that the close proximity between the Tribe's Settlement Lands and the Parcel would not have required the Secretary to give the greatest scrutiny to the "tribe's justification of anticipated benefits from the acquisition." 25 C.F.R. § 151.11(b). In sum, the record shows that the BIA complied with § 151.10, including evaluating the Tribe's need for the additional land, and we do not find that the Secretary has made a clear error of judgment.

### 3. The NAHASDA Cooperation Agreement

At the time of the BIA's decision to acquire the Parcel into trust, HUD was precluded from releasing funds pursuant to the Native American Housing Assistance and Self-Determination Act ("NAHASDA") for any tribe's housing development unless an agreement for local cooperation on issues such as taxes and jurisdiction had been entered into by the tribe and the local government where the housing was located. 25 U.S.C. § 4111(c). In the instant case, the Narragansett Tribe did not obtain such an agreement with the Town. However, § 4111(c) has now been amended to permit HUD to waive the cooperation agreement requirement, 25 U.S.C. § 4111(c),

as amended, Pub. L. 106-569, Dec. 27, 2000, and the Tribe obtained such a waiver.

The State argues that this waiver was invalid because the State apparently did not receive notice of the Tribe's application for a waiver until after it was granted. On appeal, the State contends that if the BIA accepted the waiver, the BIA has inherited the legal error and acted in an arbitrary and capricious manner. As the district court noted, "25 U.S.C. § 4111(c) establishes a prerequisite to HUD's award of housing grants. It does not pertain to the BIA's trust acquisition authority." <u>Carcieri</u>, 290 F. Supp. 2d at 179. The BIA is obligated to consider the appropriate factors enumerated in 25 C.F.R. § 151, which includes a requirement that the Secretary consider the "need of the individual Indian or the tribe for the additional land," and "[t]he purposes for which the land will be used." 25 C.F.R. § 151.10(b)-(c). It is clear from the record that the BIA has properly considered the Tribe's need for additional housing as well as the fact that the funding to purchase the Parcel was provided to the Tribe's Housing Authority with the understanding that the lands would be used for housing. However, nothing in the § 151.10 factors requires the BIA to ensure that a local cooperation agreement is in place for an Indian Housing project.

## 4. Environmental Considerations

The National Environmental Policy Act ("NEPA") and its supporting regulations promulgated by the Council on Environmental Quality ("CEQ") direct federal agencies to consider the environmental impacts of agency decisions. 42 U.S.C. §§ 4321-4370(e); 40 C.F.R. § 1500-1518 (2004). The State claims that the Secretary and BIA failed to consider environmental impacts in reaching the decision to accept the Parcel into trust because no Environmental Impact Statement ("EIS") was prepared. The State also argues that the BIA failed to conduct its own evaluation of the environmental impacts and instead improperly relied on an environmental assessment ("EA") submitted by the Narragansett Tribe. We disagree.

Federal agencies are required to prepare an EIS for any action that could significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1508.27. NEPA provides that "to the fullest extent possible . . . (2) all agencies of the Federal Government shall . . . (c) include in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on . . . (i) the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(c). However, in the absence of a finding that the proposed action would significantly affect the quality of the human environment, the BIA was not required to prepare an EIS. See,

e.g., <u>Londonderry Neighborhood Coalition</u> v. <u>Fed. Energy Regulatory Comm'n</u>, 273 F.3d 416, 419 (1st Cir. 2001) (quoting <u>Wyoming Outdoor Council</u> v. <u>U.S. Forest Serv.</u>, 165 F.3d 43, 49 (D.C. Cir. 1999)).

The CEQ has issued guidance for whether to prepare an EIS, which provides that "if the agency determines on the basis of the environmental assessment not to prepare a statement," then the agency should "[p]repare a finding of no significant impact" pursuant to § 1508.13.  40 C.F.R. § 1501.4(e).  The applicant may prepare the EA provided that the agency "make[s] its own evaluation of the environmental issues and take[s] responsibility for the scope and content of the environmental assessment."  40 C.F.R. § 1506.5(b).  In this case, the BIA followed its standard operating procedure for externally initiated proposals by obtaining an EA from the Tribe and considering it along with supplemental information the BIA requested from the Tribe and information gathered independently by the BIA.  <u>See</u> <u>Externally Initiated Proposals</u>, NEPA Handbook 4.2 B ("When the proposed Bureau action is a response to an externally initiated proposal . . . the applicant will normally be required to prepare the EA, if one is required, and to provide supporting information and analyses as appropriate.)"  After reviewing the EA and the requisite supplemental information, the BIA completed its environmental analysis and issued a Finding of No Significant Impact ("FONSI").

-51-

The BIA's issuance of a FONSI thus satisfied its responsibilities under NEPA. See 40 C.F.R. § 1501.4(e).

Separately, the State contends that the BIA should have obtained a federal consistency review in accordance with the Costal Zone Management Act ("CZMA") before making its trust determination. 16 U.S.C. § 1451-1465. The CZMA requires state consultation on federally permitted coastal development activities. Specifically, § 1456 of the CZMA provides, in relevant part:

> (1)(A) Each Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs. A Federal agency activity shall be subject to this paragraph unless it is subject to paragraph (2) or (3).
> . . .
> (C) Each Federal agency carrying out an activity subject to paragraph (1) shall provide a consistency determination to the relevant State agency . . .
> (2) Any Federal agency which shall undertake any development project in the coastal zone of a state shall insure that the project is, to the maximum extent practicable, consistent with the enforceable policies of approved State management programs.

16 U.S.C. § 1456. The State asserts that the BIA's failure to take direct action to ensure the housing project was consistent with the Rhode Island Coastal Zone Management Program ("RICZMP") before making its trust determination was a violation of the CZMA. We disagree.

The State has failed to demonstrate that a consistency review of the Tribe's housing development was necessary at the trust acquisition stage. The development of the Parcel is a project that was commenced by the Tribe, in conjunction with HUD, prior to the Tribe's application for trust acquisition. The CRMC correctly recognized that the development of the Parcel was a separate matter which required its own federal consistency determination, and properly found that the Tribe's application for trust status was consistent with the RICZMP. Id.; App. Tab 5 at Ex. 11.

### 5. The IGRA

Finally, the State contends that the true purpose of the Tribe's application for trust acquisition is the development of gambling facilities on the Parcel -- rather than development of tribal housing as the BIA found in its evaluation pursuant to 25 C.F.R. § 151.10(c) -- and that the BIA's failure to consider the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2710-2721, in its decision was an abuse of discretion. The State argues that the Secretary's decision to acquire the Parcel in trust should be reversed and that further inquiry into whether the Parcel would be used for gaming purposes is required. We disagree.

There is no evidence that the Tribe intended to use the Parcel for anything other than tribal housing, as determined by the BIA. "In fact, after the plaintiffs expressed concern over the

-53-

potential for development of a gaming facility on the parcel, the tribe reaffirmed that it intended to use the parcel for a housing development and stated that it had 'no immediate plans for any further future development.' Admin. Rec., Vol. II, Tab N." Carcieri, 290 F. Supp. 2d at 178.

As support for its position, the State points to an IBIA decision that reversed a trust acquisition decision due to the BIA's failure to consider the impact of a potential casino, even though the applicants denied any intention of using the property for a casino. Village of Ruidoso, New Mexico v. Albuquerque Area Dir. Bureau of Indian Affairs, 32 IBIA 130 (1998). However, in Village of Ruidoso, although the Tribe denied that the application for trust acquisition was for gaming purposes, the IBIA determined that it was clear from the planned gaming-related uses of the property, and the fact that the property was given to the Tribe by a company that the BIA "apparently understood to have some gaming connection with the Tribe," that the application was for gaming purposes and that the BIA's determination should have been made under the guidelines applicable to gaming. 32 IBIA at 136, 138.

We agree with the district court that "[a]lthough the possibility that the parcel might be used for gaming activities was raised before the BIA, the bureau's determination that the parcel would be used to provide housing was amply supported by the record. In view of the deferential standard of review afforded to agency

decisions under the APA, the bureau's determination in this regard must be sustained." <u>Carcieri</u>, 290 F. Supp. 2d at 178.

### III.  Conclusion

For the reasons stated above, we affirm the district court's grant of summary judgment to the Secretary.

**<u>Affirmed</u>**.

**"Dissenting opinion follows."**

**HOWARD**, <u>Circuit Judge</u> **(Dissenting in part)**. I agree with and join the court's opinion, except as to part II. C. 4. ("The State's alternative argument"). Unlike the majority, I conclude that, pursuant to the Settlement Act, the Secretary can only take the parcel into a restricted trust that provides for Rhode Island's continued criminal and civil jurisdiction over the parcel.

In part II. C. 1. of today's opinion, we hold that the Settlement Act and the JMOU it effectuates do not fairly disclose an intent to prohibit the Secretary from taking the Settlement Lands or after acquired property into trust. But that is not the same as saying that the State contemplated the Secretary making these trust acquisitions. In any event, what the State most assuredly did contemplate was the applicability of its laws throughout Rhode Island. The question is whether this understanding expressed by the parties in the JMOU and by Congress in the Settlement Act should control in circumstances not necessarily foreseen by them.[9]

The State's preservation of jurisdiction was bargained for and accomplished in at least two ways. First, with respect to the 1800 acres that were designated Settlement Lands, the

_____

[9]   In this regard, it is worth noting that the Rhode Island Settlement Act was the first such settlement of Indian land claims in an eastern state. It is not surprising then that not every eventuality was explicitly covered. But that should not prevent the court from attempting to effectuate the purpose of the JMOU and its implementing legislation to the extent possible.

applicability of Rhode Island's laws was ensured by including a provision in the Settlement Act that "Settlement Lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island." 25 U.S.C. § 1708. We have previously held that, pursuant to this provision, the civil and criminal laws of Rhode Island apply on the Settlement Lands, even though the lands were later taken into trust by the Secretary. <u>Rhode Island</u> v. <u>Narragansett Indian Tribe</u>, 19 F.3d 685, 694-95 (1st Cir. 1993).

Second, the Settlement Act extinguishes potential "Indian" claims both as to the then disputed lands and throughout Rhode Island. 25 U.S.C. §§ 1705(a)(3); 1712(a)(3). This extinguishment of Indian claims is consistent with the parties' agreement in the JMOU that "Federal legislation shall be obtained that eliminates <u>all Indian claims of any kind</u>, whether possessory, monetary or otherwise, involving land in Rhode Island, and effectively clears the titles of landowners in Rhode Island of any such claim." JMOU para. 6; H.R. Rep. No. 95-1453, at 25, 26 (emphasis added). Reflecting this intent, the pertinent language of the Settlement Act provides that "all claims . . . based upon any interest in or right involving such land or natural resources (including but not limited to claims for trespass damages or claims for use and occupancy) shall be regarded as extinguished . . . ." 25 U.S.C. §§ 1705(a)(3) & 1712(a)(3). This "all claims" language

is broad enough to include sovereignty or aboriginal title based claims contesting the applicability of Rhode Island law.

It is not surprising that the Settlement Act does not refer explicitly to the preservation of State jurisdiction outside of the Settlement Lands. As sovereign, Rhode Island already had jurisdiction outside of Settlement Lands, and the Settlement Act extinguished any potential competing "Indian" claims to that land. The only land about which there might have been doubt was the Settlement Lands, and as to that land, State jurisdiction was expressly preserved. See 25 U.S.C. § 1708. Rhode Island negotiated against the background understanding that its laws would apply throughout the State, and in the only instance where the parties thought there might be a question, they added an express provision to preserve State jurisdiction.

That the Settlement Act does not say what Rhode Island logically presumed -- that Rhode Island law would apply throughout Rhode Island -- ought not be fatal to the State's exercise of its sovereignty. In the circumstances of this case, holding that Rhode Island is divested of jurisdiction by the Secretary taking into trust the adjacent parcel that was part of the original disputed lands upsets the fairly expressed expectations of the parties. It also produces an unwarranted anomalous relationship between the Settlement Lands and the after acquired parcel. The more sensible

result is to effectuate the likely intent of the JMOU parties that Rhode Island's laws apply throughout Rhode Island.